2023 IL App (2d) 220123-U
No. 2-22-0123
Order filed May 15, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04-CF-2440 |
| JAMES E. ZOPH, | ) ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice McLaren and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Cause remanded for the limited purpose of conducting a retrospective fitness hearing and determining the issue of defendant's fitness for postconviction proceedings.

Following a jury trial in the circuit court of Lake County, defendant, James E. Zoph, was convicted

of first-degree murder of a person 60 years of age or older by exceptionally brutal or heinous

behavior indicative of wanton cruelty (720 ILCS 5/9-1(b)(16) (West 2004)) and sentenced to

natural life imprisonment.  We affirmed defendant's conviction and sentence on direct appeal.

*People v. Zoph*, 381 Ill. App. 3d 435 (2008) (*Zoph I*).  On May 14, 2008, defendant filed a *pro se*

petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2006)). Between July 2008 and February 2015, defendant filed 19 *pro se* supplemental and amended postconviction petitions. In April 2015, counsel was appointed for defendant, and the matter was advanced to the second stage of postconviction proceedings. Defendant's counsel subsequently moved for the appointment of a qualified fitness examiner to evaluate defendant as well as sought a finding of *bona fide* doubt regarding defendant's fitness for postconviction proceedings. On July 22, 2020, the court made a finding of *bona fide* doubt and ordered a fitness examination. The appointed physician concluded that defendant was fit following a fitness examination, and the postconviction proceedings continued without the court ultimately ruling whether defendant was fit for postconviction proceedings. On June 21, 2021, postconviction counsel filed an amended petition. Thereafter, at defendant's request, his postconviction counsel was discharged, and defendant was permitted to proceed *pro se*. On January 28, 2022, defendant filed his final amended postconviction petition, and he raised two claims of ineffective assistance of trial counsel. One claim was dismissed at the second stage of postconviction proceedings, and the other was ultimately denied following an evidentiary hearing.

¶ 2    Defendant appeals, arguing that the trial court erred in: (1) failing to hold a fitness hearing or rule on defendant's fitness after it expressly found a *bona fide* doubt as to his fitness for postconviction proceedings; and (2) dismissing one of defendant's ineffective assistance of trial counsel claims without an evidentiary hearing. We agree with defendant's first claim of error and remand the cause for the limited purpose of conducting a retrospective fitness hearing to determine whether defendant was fit for postconviction proceedings.

¶ 3                                    I. BACKGROUND

¶ 4 The facts were thoroughly recounted by this court in *Zoph I*. We briefly summarize them to give context to the instant appeal. On June 29, 2004, in Zion, Illinois, defendant's aunt, Wanda Walker, was found dead in the home that she shared with her sister, defendant's adoptive mother, Betty Zoph. Zoph adopted defendant when he was about eight years old, and defendant lived in her home until about 1995, when defendant was in his mid-20's. At the time of her death, Walker was a 66-year-old woman who was physically disabled. She was discovered on the floor in the basement of her home. Walker had bleeding in her brain, as well as fractures to her jaw, hyoid bone in her neck, and eight ribs. She also showed signs of strangulation and had extensive bruising on her face and neck. The pathologist concluded that blunt-force trauma caused Walker's death.

¶ 5 Police arrived at the scene in response to an alarm from the home's security system. Glass from the basement window had been removed, apparently to frustrate the alarm system. Above the window was a smudged palm print, which did not match defendant or anyone in the home. A sliding glass door was slightly ajar, which the officers used to gain initial entry into the home. The bathroom toilet in the basement had a wad of tissue paper in the bowl, above the water, and defendant's DNA was present on the paper. On June 30, 2004, at approximately 12:30 a.m., defendant was arrested while he attempted to steal a vehicle from a used car lot in Winthrop Harbor.

¶ 6 The State's evidence showed that defendant confessed to the murder during questioning by investigators Charles Schletz and Kevin Harris of the Lake County Major Crimes Task Force. Specifically, defendant told the investigators that he had arrived in the area a few days prior in order to investigate an inheritance from his father that defendant believed he was cheated out of. Defendant reported that he approached the house from the rear and removed a window to evade the security system. He entered the lower level of the house to look for some papers. At the time

he entered the house, he wore black leather gloves and a black t-shirt with a Maltese cross on it. He was carrying a duffel bag and tools. As defendant searched the basement, Walker came downstairs and confronted him. Defendant put Walker in a chokehold until he believed she had passed out, and he laid her on the floor. He resumed his search for the papers, but Walker sat up, and defendant kicked her in the head, causing her to fall back to the floor. Walker sat back up again, and defendant "lost it." He choked her and stomped on her head, chest, and face until she stopped moving.

¶ 7     Defendant then gathered his tools in his duffel bag and left the house, which caused the alarm to go off. Defendant walked to Beulah Park, where he walked in circles to throw off any bloodhounds that the police might use to track him. There, in a wooded area, he discarded the t-shirt and gloves he had been wearing, and he discarded his duffel bag under some powerlines on the side of a road. In the evening, defendant visited a friend to get a screwdriver and then proceeded to a used car lot, where he attempted to steal a vehicle in order to leave town. He was apprehended while he sat in one of the vehicles.

¶ 8     During his questioning, defendant offered to show the investigators where he discarded the t-shirt and gloves. The detectives arranged for evidence technicians to meet them, and they drove defendant to Beulah Park. Once there, defendant showed them the approximate area where he discarded the items. The investigators transported defendant back to the Sheriff's department while the evidence technicians searched the area. As they drove, defendant pointed out the route that he had walked from Walker's house to Beulah Park. The evidence technicians eventually recovered a black t-shirt with a Maltese cross on it and a pair of black leather gloves in the woods.

¶ 9     When they returned to the Sheriff's department, defendant agreed to provide a handwritten statement. The statement contained the same facts set out above. After defendant completed the

written statement, the officers asked defendant if he would read the statement while being video recorded, but he declined. Forensic testing showed that Walker's blood was found on the cuff of the pants defendant was wearing, and defendant's DNA was found on the tissue that was recovered from the toilet in Walker's home.

¶ 10    Defendant testified at trial on his own behalf. He denied any involvement in the murder. Specifically, he testified that at the time of the murder, he was "basically homeless" and was sleeping at various locations in the Lake County area. On the morning of June 29, 2004, he had just returned from Indiana, and he went to his mother's house because he had nowhere else to go. He approached the home from the rear alley and observed that a window and screen had been removed. At the time, he was carrying a bag of clothes, which included a black t-shirt with a Maltese cross. He climbed through the window and found Walker's body on the floor. Defendant tried to find Walker's pulse, but she did not have one. Defendant testified that he heard noises coming from upstairs, and he crept up a few stairs and "could see movement in [Walker's] room." He became startled and then "bolted" out through the rear sliding glass door of the residence, which caused the alarm to go off. He did not contact the authorities because he was afraid that he would be blamed for the murder. Defendant testified that he then walked to Beulah Park, and thereafter spent the day at various locations in Winthrop Harbor. He purchased food at a convenience store and latex rubber gloves, which he intended to use to steal a vehicle later that evening. He also visited a friend's house to borrow a large screwdriver, "because it's a great tool for peeling the column on a GM vehicle." Defendant walked to a used car lot, where he was arrested while attempting to steal a truck.

¶ 11    Defendant testified that investigators Schletz and Harris initially asked him to write a statement implicating defendant's father-in-law in Walker's murder. Defendant began to write a

statement against his father-in-law, but he changed his mind and "invoked [his] right to counsel." The officers responded that "that wasn't going to happen," and they "denied [defendant] access to anyone." The investigators threatened that if defendant did not implicate his father-in-law, they would make it look like defendant had murdered Walker. Defendant reiterated his request for an attorney, but the investigators again refused. The investigators took defendant to Beulah Park in an unmarked police vehicle. When they arrived, Schletz opened the trunk of the vehicle and proceeded into the woods. Defendant remained in the car and could not see what Schletz did in the trunk. He also could not tell if Schletz carried anything as he entered the woods. Schletz returned to the car about ten minutes later, and the investigators walked defendant into a cornfield, stood with him there for three minutes, and then drove him back to the Sheriff's department.

¶ 12    Defendant testified that, when they returned to the interrogation room, Schletz continued to threaten him. Schletz told defendant that he was defendant's only chance to avoid a death or natural life sentence. According to defendant, he asked Schletz what he would have to do in order to be allowed to make a phone call. Defendant testified that he really wanted to speak with [his] wife, [Michelle Tully], who also [was] an attorney." Schletz told him to "write the statement that [Schletz] want[ed]," and defendant would be allowed to make a call. Defendant stated that he "failed creative writing," and so Schletz wrote out a statement and instructed defendant to copy it verbatim. Defendant testified that he then copied the statement in his own handwriting onto an official statement form, because that was the only way to get Schletz "out of [his] face."

¶ 13    During his testimony, defendant then proceeded to deny the pertinent details of the written statement. He acknowledged entering Walker's home through the window and subsequently traveling through Beulah Park, but he denied killing Walker. He testified that, as far as he knew,

his t-shirt was in his bag when he was arrested, but he agreed it was possible that he dropped it in Beulah Park as he was searching for something in the bag. He denied ever owning leather gloves.

¶ 14 The jury found defendant guilty of first-degree murder of a person 60 years of age or older by exceptionally brutal or heinous behavior indicative of wanton cruelty. The trial court denied defendant's motion for a new trial and sentenced him to natural life imprisonment. We affirmed defendant's conviction and sentence on direct appeal. *Zoph I*, 381 Ill. App. 3d 435.

¶ 15 Defendant filed the first version of his *pro se* postconviction petition on May 14, 2008. Among other claims, defendant alleged that his statements to the detectives were taken in violation of his fifth amendment right to counsel because his wife, Tully, was at the Sheriff's department, identified herself as defendant's attorney, and was denied access to him prior to him making any incriminating statements.

¶ 16 Between the filing of his first *pro se* petition on May 14, 2008, and February 4, 2015, defendant filed 19 amended *pro se* postconviction petitions. In his February 4, 2015, supplemental postconviction petition, defendant stated that he made "a good faith effort to exercise due diligence" and "made several *pro se* supplemental amendments." He further stated that he "is skizaphrenic [*sic*] and *** was not being treated with psychiatric medicine for this serious mental health condition and the pro-se amendments were made in a scatter-brained nature." He thereafter purported to raise 21 separate constitutional violations.

¶ 17 Relevant to the second issue defendant raises in this appeal, defendant's April 29, 2010, amendment included an affidavit from Tully, executed March 3, 2010, averring that on June 30, 2004, at approximately 12:30 p.m., she arrived at the Lake County Sheriff's department and "attempted to see [her] client, James E. Zoph," but she was "denied access to him." She further

averred that she "tried a few hours later and again was denied access."  She also called the Sheriff's department later that evening but was given no information.

¶ 18     On April 6, 2015, the trial court entered an order stating that, although defendant's various petitions were "sometimes repetitive, sometimes contradictory, sometimes confusing, sometimes irrelevant[,] and sometimes facially inaccurate," defendant nevertheless, "at times[,] stated the gist of a constitutional claim." The court therefore appointed counsel to represent defendant and advanced the matter to the second stage of postconviction proceedings.  Between 2017 and 2019, postconviction counsel requested and received time to review the record and amend the petition, while defendant wrote letters to the court complaining about her representation.

¶ 19     On February 4, 2019, defendant requested and was allowed to proceed *pro se*.  Then, on October 11, 2019, defendant filed a *pro se* amended postconviction petition.   Pertinently, the amended petition alleged that his trial counsel was ineffective for failing to discover that Tully had been interviewed at the Sheriff's department at 1:30 p.m. on June 30, 2004.  Attached to the petition was Tully's March 3, 2010, affidavit and a police report.

¶ 20     On October 18, 2019, at defendant's request, the court reappointed counsel to represent defendant.

¶ 21     On May 4, 2020, the court received a letter from defendant that stated he had "late-breaking information that will have a drastic impact on [his] constitutional claims, as well as the outcome of this procedure."  The letter did not specify what the information was.

¶ 22     Defendant sent a second letter to the court, which the court received on June 24, 2020. Among other topics, defendant stated in the letter that he advised postconviction counsel that his " 'given' name is actually 'James Samuel Webb,' and [he] was abducted in Australia in 1969  by a 'Margo Petterson' and a 'Claudia Petterson.' "  Defendant continued that this information was

"materially relevant" because Margo Petterson testified at defendant's trial "while using the 'assumed identity' of 'Betty R. Zoph,' " defendant's adoptive mother. He further stated that, to the best of his knowledge, Margo Petterson had "a warrant (out of Australia) for murder and kidnapping." Defendant lamented that the public defenders who had represented him refused to review or investigate this claim.

¶ 23    The court received a third letter from defendant on July 6, 2020. Defendant restated several assertions from his second letter to the court. Specifically, he stated that his "given name is James Samuel Webb and [he] was abducted out of Australia in 1969 by a 'Margot Petterson' and *** was trafficked into the United States by Margo and Claudia Petterson."[1]    He continued that " 'Margo Petterson' is currently residing in Zion, IL and currently using the assumed identity of Betty Zoph." He stated that whenever he attempted to address this information with trial counsel, his counsel "would immediately end the visit." Defendant also asserted that counsel was "aware that [defendant did] not have any grade school records" because he "was not allowed to attend grade school because Margo Petterson (a.k.a. 'Betty Zoph') was not able to establish that [defendant had] any 'official' birth records." Defendant stated that he spoke with postconviction counsel via telephone on June 29, 2020, and counsel informed him that she would make a "motion for a 'fitness exam' on July 21, 2020." Defendant continued in his letter that a fitness examination was irrelevant to his constitutional claims and was a "stalling tactic" to protect the State's case. Defendant concluded his letter by stating that, if the court were to order a fitness examination, he would comply with the order.

---

[1]We observe that defendant spelled his alleged abductor's name as both "Margot" and "Margo" within this letter.

¶ 24    In court on July 22, 2020, the following colloquy transpired between postconviction counsel and the court:

> "MS. SNYDER [(POSTCONVICTION COUNSEL)]: Good morning. I had an opportunity to speak to [defendant] telephonically since our last court. I know he has caused to be filed some more documents to the Court. Based upon the documents I am receiving from him and my conversations with him, I am asking the Court to order a fitness evaluation which I know is certainly not the usual practice in a post-conviction.
>
> However, based upon my most recent conversations with [defendant], I am asking the Court to order the evaluation. I did file with the Court my reasons for asking the court to find a *bona fide* doubt and order a fitness evaluation. I hope it made the court file. I am not sure procedurally how the Court would like to proceed. Do you want to have him evaluated here or evaluated in the Department of Corrections?
>
> THE COURT: He can't be brought back here at the moment. Based on your observations and your communication, I will find a *bona fide* doubt. What I am going to do is sign an order to have him evaluated in the Department. I am not quite sure what that is going to look like, but we will at least give them an opportunity to initiate that process.
>
> MS. SNYDER: He did advise me, Judge, that he was going to refuse to cooperate. I think maybe a shorter date might make sense just to see if he is going to comply with the request."

The court then set the matter for status for August 18, 2020.

¶ 25    The order, filed on July 23, 2020, pertinently provided:

"THIS MATTER COMING BEFORE THE COURT, present before the Court is the State, counsel for defendant and the defendant, the Court making the following findings of fact:

The Petitioner has filed with the court and communicated to counsel that he is not, in fact, James Zoph. That he was abducted from Australia as a child and brought to the United States. That his abductor is currently posing as Betty Zoph. He makes demands that this matter be investigated as a precursor to any further dealings on his post-conviction petition. In prior post-conviction filings by the Petitioner, he indicates that he was diagnosed with manic-depressive disorder, has been psychiatrically hospitalized, has auditory hallucinations and suffers from PTSD.

Counsel attempted to speak to Mr. Zoph, who insists he is actually James Webb, but he refused to speak to any issues other than his abduction and asking counsel to investigate markings on [*sic*] scars on Betty Zoph's body to establish that she abducted him. He would not discuss his post-conviction petition.

Based upon this, the Court finds there is a *bona fide* doubt as to the defendant's fitness to proceed with his postconviction petition.

IT IS HEREBY ordered that a doctor designated by the 19th Judicial Circuit shall conduct a fitness evaluation pursuant to 725 ILCS 5/104-13 for purposes of determining the defendant's fitness to proceed with his post-conviction petition."

¶ 26 Dr. Anthony P. Latham evaluated defendant on August 6, 2020, via the Zoom videoconferencing application and filed a fitness report with the court on August 17, 2020. Dr. Latham noted that defendant "has been diagnosed with serious and persistent psychiatric disorder

for nearly two decades per reviewed records," and his "diagnostic impressions *** include bipolar disorder, schizoaffective disorder, and delusional disorder." Dr. Latham stated that, "[c]onsistent with past reported delusional thought, [defendant] asserted he was abducted in childhood by the Petterson women. He also reported that Margo Petterson assumed the identity of Ms. Betty Zoph and provided perjured testimony at his murder trial in which he was found guilty." Dr. Latham noted that "[d]elusional thought associated with delusional disorder is often specific or encapsulated to discrete experiences."

¶ 27    In the report, Dr. Latham stated his belief that defendant had a factual understanding of the legal proceedings, including the role of the judge, the State, and postconviction counsel. He stated that defendant's insistence that "events or processes are in accordance with his desires" may impact his ability to work cooperatively with others but, as of the date of the examination, defendant "appear[ed] to present capacity to assist defense counsel in the preparation of a postconviction petition." Dr. Latham ultimately recommended that the trial court find defendant fit.

¶ 28    At the next status hearing on August 18, 2020, the parties appeared in court to discuss the results of the fitness examination. The following is the entirety of the court proceedings that day regarding this case:

> "THE CLERK: This is People versus Zoph, 04 CF 2440.
>
> MR. NEWMAN [(ASSISTANT STATE'S ATTORNEY)]: People by Assistant State's Attorney Jim Newman. The Defendant is not present. He is in the custody of the Illinois Illinois [*sic*] Department of Corrections. Jennifer Snyder is present on his behalf. It is up today for status, Judge. Ms. Snyder was kind enough to send the fitness evaluation that was recently completed. I just was reading it this morning[,] so that is what it is up for today.

MS. SNYDER:  Good morning.

THE COURT:  I'm sorry.  I haven't seen it yet.

MS. SNYDER: And I received a file copy and an e-mail from Dr. Latham so I think there is a copy that may be making it to the Court, but I can certainly forward mine if you like.

THE COURT:  What was Dr. Latham's conclusion?

MS. SNYDER:  Fit.

THE COURT:  Okay.  So what would you like to do, Ms. Snyder?

MS. SNYDER:  Judge, if I could continue it to October 20th, if that is an okay date with the court.  I'm hoping that Mr. Zoph and I can move forward.

THE COURT:  Motion defendant 10-20.

MS. SNYDER:  Thank you, Judge.  Have a good day.

THE COURT:  You too.

MR. NEWMAN:  Thank you."

¶ 29   On June 9, 2021, postconviction counsel filed a "Supplemental Petition for Post-Conviction Relief."  Counsel included a brief procedural history of the postconviction proceedings as well as raised two claims, namely that: (1) trial counsel was ineffective for failing to file a motion directing the State to run certain fingerprint evidence through the Automated Fingerprint Identification System (AFIS); and (2) appellate counsel was ineffective for failing to speak with defendant regarding his claims of error.  On October 26, 2021, the State moved to dismiss the petition.

¶ 30   Before that motion was heard, however, defendant sent the trial court a letter on December 13, 2021, requesting that his appointed counsel be discharged because the supplemental petition

that counsel filed on defendant's behalf "grossly understat[ed]" his constitutional claims. Defendant also stated in the letter his intention to file another *pro se* supplemental petition. On January 6, 2022, the trial court granted defendant's request to discharge his counsel and allowed defendant to represent himself *pro se*.

¶ 31    On January 28, 2022, defendant filed what would be his final amended *pro se* postconviction petition. He raised two claims, namely that: (1) trial counsel was ineffective for failing to discover and introduce evidence at the hearing on the motion to suppress confession showing defendant invoked his right to counsel during police questioning, and that Tully was at the Sheriff's department and requested to see defendant as his attorney before defendant made any incriminating statements; and (2) trial counsel was ineffective for failing to request further forensic testing of certain evidence that was recovered at the crime scene. Defendant attached several exhibits to his petition, including a copy of Tully's March 3, 2010, affidavit, as well as an affidavit executed by defendant on January 3, 2022. In that affidavit, defendant averred that he entered Walker's house at the time of the murder and observed Nick Vitruls and Mark Miller attacking Walker, but he then "blacked out" for two to three minutes. He continued in the affidavit that, after he regained consciousness, he observed Walker on the floor. Defendant stated that his pants leg accidentally brushed Walker's right ear, which was bleeding, as he picked up her broken eyeglasses from the floor. He further averred that, during his police interrogation on June 30, 2004, he requested an attorney at 7:00 a.m., 9:00 a.m., 11:00 a.m., and 12:00 p.m., but the requests were denied. Defendant further stated in his affidavit that he did not make any incriminating statements until after 1:00 p.m., which was when Schletz coerced him into copying the statement that Schletz had prepared.

¶ 32 At a hearing on February 2, 2022, defendant clarified that he was proceeding on his January 28, 2022, postconviction petition, and no other.

¶ 33 On February 9, 2022, the State filed a motion to dismiss defendant's January 28, 2022, *pro se* supplemental petition for postconviction relief. Concerning the first issue raised, the State argued that, even if Tully's affidavit were true, defendant had already waived his *Miranda* rights, given a full confession to the police, and accompanied the police to Beulah Park before 12:30 p.m. on June 30, 2004, which is when Tully alleges in her affidavit she arrived at the Sheriff's department. Additionally, the State argued that Tully's affidavit was refuted by a police report that defendant attached to his October 11, 2019, petition, which indicated Tully was interviewed at the Sheriff's department at 1:45 p.m. on June 30, 2004. Concerning defendant's second claim, the State argued that any further forensic analysis was entirely predicated on his claim, made many years after he testified at trial, that he either saw two assailants attacking Walker, or that he saw the assailants running from the crime scene. It stressed that defendant's theory contradicted his trial testimony and his postconviction petitions that he filed prior to 2015.

¶ 34 On February 17, 2022, after a hearing, the trial court granted the State's motion to dismiss defendant's first claim. Specifically, it found that even if Tully was at the Sheriff's department at 12:30 p.m. on June 30, 2004, the defendant had already made the "most damaging" part of his statement, in that he had already reenacted the crime and led the investigators to Beulah Park, where evidence of the murder was found. The court continued that, at best, Tully arrived at the Sheriff's department "near the end" of when defendant finished his written statement, and the "police are not required to stop everything they're doing because somebody who identifies themselves as an attorney is there." The court also found it significant that Tully did not prepare her affidavit until 2010, despite her availability during defendant's trial.

¶ 35    The trial court denied the State's motion to dismiss the defendant's second claim, and that claim proceeded to a third-stage evidentiary hearing on March 2, 2022. On April 11, 2022, the trial court entered an order denying defendant's January 28, 2022, postconviction petition.

¶ 36    Defendant timely filed a notice of appeal.

¶ 37                                    II. ANALYSIS

¶ 38    The Act provides a mechanism by which a person under a criminal sentence may challenge his or her conviction as being the result of a substantial denial of his or her rights under the federal or state constitution. *People v. Mendez*, 402 Ill. App. 3d 95, 98 (2010). A proceeding under the Act is not an appeal, but rather, is a collateral attack on the prior judgment. *People v. Clark*, 2023 IL 127273, ¶ 38. The Act allows "inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *Id.* (quoting *People v. Barrow*, 195 Ill. 2d 506, 519 (2001)). Such a proceeding is commenced by filing a petition which clearly sets forth how the defendant's constitutional rights were violated. *People v. Hodges*, 224 Ill. 2d 1, 9 (2009). The Act contemplates the filing of just one petition (*People v. Edwards*, 2012 IL 111711, ¶ 21), and any claim not raised in the original or amended postconviction petition is forfeited (725 ILCS 5/122-3 (West 2020)). Counsel may be appointed to indigent petitioners in postconviction proceedings if the original petition is determined to be nonfrivolous. *Id.* § 122-4; *People v. Owens*, 139 Ill. 2d 351, 358 (1990). The defendant bears the burden of making a substantial showing of a constitutional violation (*People v. Shaw*, 2019 IL App (1st) 152994, ¶ 19) and is entitled to an evidentiary hearing on the petition only if he or she meets this burden (*People v. Shum*, 207 Ill. 2d 47, 57 (2003)).

¶ 39    Defendant contends that, after expressly finding a *bona fide* doubt as to his fitness for postconviction proceedings, the trial court erred by failing to hold a fitness hearing and

determining whether or not defendant was fit. In defendant's view, because the trial court's *bona fide* doubt was never resolved, the orders dismissing and denying his postconviction petition should be reversed and the cause remanded for a contemporaneous fitness hearing and new postconviction proceedings.

¶ 40 In response, the State disputes that the trial court found a *bona fide* doubt as to defendant's fitness. It argues instead that the court merely granted defendant a fitness examination, which the State emphasizes concluded defendant was fit. Therefore, the State contends that, in the absence of a finding of *bona fide* doubt, defendant had no right to a fitness hearing. Alternatively, the State argues that, even if the court erred, defendant invited the error, and the error was harmless beyond a reasonable doubt.

¶ 41 Defendant concedes that he failed to preserve the issue because he neither expressly demanded that the trial court rule on his fitness before proceeding further, nor did he raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for review, a defendant must object at trial and raise the issue in a posttrial motion). Forfeiture rules "exist to encourage defendants to raise issues in the trial court, thereby ensuring both that the trial court has an opportunity to correct any errors prior to appeal and that the defendant does not obtain a reversal through his or her own inaction." *People v. Denson*, 2014 IL 116231, ¶ 13. However, forfeiture is a limitation on the parties rather than the court, and a reviewing court may consider a forfeited argument. *People v. Sophanavong*, 2020 IL 124337, ¶ 21. Indeed, we may overlook forfeiture and address the merits when necessary to maintain a sound and uniform body of precedent or achieve a just result. *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 22. We choose to overlook defendant's forfeiture because the issue concerns defendant's fitness to collaterally attack his criminal conviction under the Act. See also *People v. Johnson*, 191 Ill. 2d

257, 274-75 (2000) (declining to find waiver where the parties and the court proceeded under an erroneous view of the law concerning which party bore the burden of proving defendant fit for postconviction proceedings after a *bona fide* doubt had been raised).

¶ 42     Before turning to the merits, however, it is necessary to clarify the applicable law.  The parties argue that this appeal implicates sections 104-11(a) and (b) of the Code of Criminal Procedure (Code).  725 ILCS 5/104-11(a), (b) (West 2020).  Pursuant to section 104-11(a), the issue of a defendant's "fitness for trial, to plead, or to be sentenced may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial."  *Id*. § 104-11(a).  Under section 104-11(b), the court can appoint an expert to examine the defendant to assist it in determining whether a *bona fide* doubt of fitness exists.  *Id*. § 104-11(b). "[T]he primary distinction between sections 104-11(a) and 104-11(b) is that section 104-11(a) ensures that a defendant's due process rights are not violated when the trial court has already found *bona fide* doubt to have been raised, while section 104-11(b) aids the trial court in deciding whether there is a *bona fide* doubt of fitness."  *People v. Hanson*, 212 Ill. 2d 212, 218 (2004).  Once facts that raise a *bona fide* doubt are presented, the trial court must hold a fitness hearing.  *People v. Hill*, 308 Ill. App. 3d 691, 701 (1999).

¶ 43     Contrary to the parties' arguments, these portions of the Code are not directly implicated in the instant matter.  Defendant is not raising an issue regarding his fitness to stand trial, to plead, or to be sentenced.  Rather, he raises the issue of his fitness for postconviction proceedings.  See *Owens*, 139 Ill. 2d at 358 ("[n]othing in [section 104] requires or permits a hearing to determine whether a petitioner is fit to assist counsel in post-conviction proceedings").  Even though sections 104-11(a) and (b) are not directly applicable, that does not mean the issue of fitness is irrelevant in postconviction proceedings.  A trial court must still consider the issue of a defendant's

competency for postconviction proceedings. *Owens*, 139 Ill. 2d 351. As will be discussed in greater detail below, the context in which the issue of fitness is raised matters, because a defendant's required level of competency during postconviction proceedings is less than that required at trial. *Johnson*, 191 Ill. 2d at 269; *Owens*, 139 Ill. 2d at 363. A defendant is presumed fit to stand trial, to plead, and to be sentenced. *Johnson*, 191 Ill. 2d at 269 (citing 725 ILCS 5/104-10 (West 1998)). "A defendant is unfit to stand trial when, 'because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense.' " *Id.* (quoting 725 ILCS 5/104-10 (West 1998)). In postconviction proceedings, a defendant is likewise presumed fit. *Owens*, 139 Ill. 2d at 362. A defendant is considered unfit for postconviction proceedings when, because of a mental condition, he cannot communicate his allegations of constitutional deprivations to counsel, thus frustrating his entitlement, under the [Post-Conviction Hearing] Act, to a reasonable level of assistance." *Johnson*, 191 Ill. 2d at 269.

¶ 44 When a *bona fide* doubt of a defendant's fitness to proceed with postconviction proceedings is raised, the court may order a psychological evaluation of the defendant and consider the matter at an evidentiary hearing. *Owens*, 139 Ill. 2d at 365. After making such a finding, the court must determine whether the defendant is competent to consult with appointed counsel. *Id*. Whether a *bona fide* doubt as to a defendant's fitness to proceed with postconviction proceedings exists is within the discretion of the trial court, because it is in the best position to observe a defendant's conduct. *Johnson*, 191 Ill. 2d at 269.

¶ 45 Having clarified the appropriate framework in which to analyze defendant's primary claim of error, we address the threshold dispute between the parties, namely, whether the trial court found that there was a *bona fide* doubt of defendant's fitness for postconviction proceedings. In this case,

the record is abundantly clear that it did. As noted, while defendant was represented by appointed postconviction counsel, he sent a series of letters to the court that, if sincere, arguably called into question his ability to communicate his allegations of constitutional depravation to his appointed counsel. On May 4, 2020, the court received a letter from defendant stating that he had "late-breaking information that will have a drastic impact on [his] constitutional claims, as well as the outcome of this procedure." On June 24, 2020, the court received a letter from defendant stating that his real name was actually James Samuel Webb and that he was abducted in Australia in 1969 by Margo and Claudia Petterson. He continued that this information was "materially relevant" because Margo Petterson testified at his trial using the assumed identity of Betty Zoph, defendant's adoptive mother. Defendant further stated that there was a warrant issued in Australia for Margo Petterson's arrest related to charges for kidnapping and murder. Defendant also voiced his frustration with his appointed counsel for failing to investigate the abduction.

¶ 46 The court received a third letter from defendant on July 6, 2020. There, defendant reiterated that his true name was James Samuel Webb and that he was "abducted out of Australia in 1969 by a 'Margot Petterson' and *** was trafficked into the United States by Margo and Claudia Petterson," as well as that Margo Petterson was "using the assumed identity of Betty Zoph." Defendant lamented that whenever he attempted to address the foregoing information, his counsel would end the visit with him. Defendant also noted that he spoke with his postconviction counsel via telephone on June 29, 2020, and she told him that she would file a motion seeking a fitness examination. Defendant expressed his view that a fitness examination was irrelevant to his constitutional claims and was a "stalling tactic" to protect the State's case.

¶ 47 Before the court on July 22, 2020, postconviction counsel requested that the court both find a *bona fide* doubt as to defendant's fitness and order a fitness examination.[2] Counsel explained that the basis for her requests were the conversations she had with defendant and documents he had provided to her, as well as the letters that defendant sent to the court. The trial judge then issued his ruling, stating that, "[b]ased on [postconviction counsel's] observations and your communication, I will find a *bona fide* doubt," and ordered a fitness examination. The court thereafter issued a written order detailing its reasons for finding a *bona fide* doubt and ordering a fitness examination. Pertinently, the order stated:

> "The Petitioner has filed with the court and communicated to counsel that he is not, in fact, James Zoph. That he was abducted from Australia as a child and brought to the United States. That his abductor is currently posing as Betty Zoph. He makes demands that this matter be investigated as a precursor to any further dealings on his post-conviction petition. In prior post-conviction filings by the Petitioner, he indicates that he has been diagnosed with manic-depressive disorder, has been psychiatrically hospitalized, has auditory hallucinations and suffers from PTSD.
>
> Counsel attempted to speak to Mr. Zoph, who insists he is actually James Webb, but he refused to speak to any issues other than his abduction and asking counsel to investigate markings on [*sic*] scars on Betty Zoph's body to establish that she abducted him. He would not discuss his post-conviction petition.

---

[2]The written motion does not appear in the record on appeal. As reflected in the report of proceedings, postconviction counsel described the motion as "asking the Court to find a *bona fide* doubt and order a fitness evaluation."

Based on this, the court finds there is a *bona fide* doubt as to the defendant's fitness to proceed with his post-conviction petition."

The order further provided that, pursuant to section 104-13 of the Code, a doctor designated by the Lake County circuit court would conduct a fitness examination "for the purpose of determining the defendant's fitness to proceed with his post-conviction petition."

¶ 48    The State describes the trial court's statements and written order as "inartful," and argues that the court merely ordered a fitness examination to assist it in evaluating whether there was a *bona fide* doubt as to defendant's fitness in the first place—and not that it actually found a *bona fide* doubt.    The State asserts that defendant confuses the trial court's granting of a fitness examination "as an implicit signal that the trial court itself found a *bona fide* doubt regarding defendant's fitness."    This argument is untenable.    In essence, the State requests that we construe the trial court's oral pronouncement that it "find[s] a *bona fide* doubt" and it's written finding that "there is a *bona fide* doubt as to the defendant's fitness to proceed with his post-conviction petition" to mean that it did *not* find a *bona fide* doubt.    Both the court's oral pronouncement of its ruling and the court's written order memorializing its ruling were clear and unambiguous that it did find a *bona fide* doubt, and it provided a detailed explanation in support of its ruling.    The court also noted defendant's refusal to discuss his postconviction petition with his counsel until the alleged abduction was investigated, which arguably impeded counsel's ability to consult with defendant to ascertain his claims of constitutional deprivations.

¶ 49    Almost as if to remove any doubt as to its intent, the trial court further detailed in its written order that it was ordering a fitness examination "for the purpose of determining the defendant's fitness to proceed with his post-conviction petition."    If, as the State argues, the court meant only to appoint an expert to help it determine whether a *bona fide* doubt existed, it would not have made

oral and written findings of *bona fide* doubt and then specified in its written order that the purpose of the examination was to determine defendant's fitness to proceed in the postconviction process. If the court had appointed a qualified expert to examine defendant only to assist it in determining whether there was a *bona fide* doubt, it would have so stated. The State's argument that the court ordered the examination "to assist in determining whether a *bona fide* doubt as to fitness actually existed," is directly rebutted by the record.

¶ 50    Neither case relied on by the State alters our determination on this issue. At the outset, we observe that the cases relied on by the State arise in a slightly different context, as they concern the issue of a defendant's fitness to stand trial as opposed to fitness to participate in postconviction proceedings. See 725 ILCS 5/104-11(a), (b) (West 2020). Because the standards of fitness are context dependent, the cases are distinguishable from the instant matter on that ground alone. Further, as persuasive authority, the cases are inapposite.

¶ 51    The first case is *Hanson*, 212 Ill. 2d 212, which the State asserts is dispositive of defendant's argument. In *Hanson*, defense counsel requested that the defendant be examined by an expert to determine his fitness for trial and his mental condition at the time of the offense. *Id.* at 215. The motion also noted counsel's belief that a *bona fide* doubt existed as to the defendant's trial fitness. *Id.* The trial court granted the motion. *Id.* After an examination, the expert deemed the defendant fit, and counsel withdrew the motion. The appellate court found plain error and concluded that the grant of a fitness hearing implicitly demonstrated the trial judge's *bona fide* doubt regarding defendant's fitness. *Id.* On review, the Illinois Supreme Court was thus tasked with deciding whether the grant of a defendant's request for a fitness examination implicitly signaled that the trial court found a *bona fide* doubt so as to trigger the right to a fitness hearing. *Id.* at 216. The court answered this question in the negative and held that the "mere act of granting

a defendant's motion for a fitness examination cannot, by itself, be construed as a definitive showing that the trial court found a *bona fide* doubt of the defendant's fitness." *Id*. at 222. *Hanson* is readily distinguishable. Here, defendant makes no claim that the court *implicitly* found a *bona fide* doubt as to his fitness. This is so because the court *expressly* made a finding of *bona fide* doubt. Accordingly, there is no need to infer whether the court believed there was a *bona fide* doubt concerning defendant's fitness. This scenario stands in stark contrast to that in *Hanson*, where the trial court granted counsel's motion for a fitness examination without making an express finding concerning whether a *bona fide* doubt existed. *Id*. at 215. The State's reliance on *Hanson* is therefore misplaced.

¶ 52     The State also relies on *People v. Edwards*, 2021 IL App (3d) 130190-C. There, the trial court signed an order prepared by defense counsel stating that it found a *bona fide* doubt as to the defendant's fitness for trial and ordering a fitness examination. *Id*. ¶¶ 10-11. A doctor examined the defendant and concluded he was fit (*id*. ¶ 12), and the defendant was ultimately convicted (*id*. ¶ 45). On appeal, the defendant argued that the court erred in failing to hold a fitness hearing before proceeding to trial, which he asserted was required following the court's finding of a *bona fide* doubt. *Id*. ¶ 63. The appellate court found no error, reasoning that the trial judge merely ordered a fitness evaluation to determine whether a *bona fide* doubt existed in the first place, the judge's signature on the order notwithstanding. ¶ 72. In addressing the "*bona fide* doubt" language in the order, the court stated that the written order was "inartful" and observed that it was prepared by defense counsel, and that the trial court's "oral comments and actions" demonstrated that it had merely ordered a fitness evaluation to assist it in determining whether a *bona fide* doubt actually existed. *Id*. ¶ 72. The record also lacked any indication that "the trial court or the State implicitly agreed with defense counsel, or raised on their own a *bona fide* doubt of defendant's fitness." *Id*.

¶ 71. *Edwards* is distinguishable. In *Edwards*, the appellate court was plainly concerned that the written order containing the language "*bona fide* doubt" did not reflect the trial court's true ruling, in part, because the order was drafted by the defendant. That concern is not implicated here because the court prepared the order itself. Further, unlike *Edwards*, the court here made an oral pronouncement that it found a *bona fide* doubt as to defendant's fitness to proceed, and that finding is in harmony with the court's written order.

¶ 53 Having determined that the trial court found a *bona fide* doubt as to defendant's fitness for postconviction proceedings, the question becomes whether the court erred in allowing the proceedings to continue without determining defendant's postconviction fitness. On this question, the Illinois Supreme Court's decision in *Owens*, 139 Ill. 2d 351, which established postconviction petitioners' right to fitness hearings, is instructive.

¶ 54 In *Owens*, the defendant appealed from the denial of his postconviction petition and argued that the trial court erred by failing to hold a fitness hearing to determine whether he could meaningfully communicate with and assist his appointed postconviction counsel. *Id*. at 357. Counsel had sought the appointment of an expert under section 104-13 of the Code, arguing that there was a *bona fide* doubt as to the defendant's fitness because, when counsel attempted to interview him, the defendant repeatedly interjected irrelevant, frivolous, and unintelligible matters into their conversation. *Id*. at 356-57, 361. The trial court denied the motion on the basis that the Act did not require a fitness hearing. *Id*. at 361. Thereafter, the court denied the postconviction petition following an evidentiary hearing. *Id*. at 357.

¶ 55 Our supreme court vacated the judgment dismissing the petition and remanded the matter for the trial court to determine whether the facts brought to its attention, either by counsel or the court's own observations of the defendant, raised a *bona fide* doubt as to the defendant's mental

ability to communicate with his postconviction counsel. *Id.* at 362. The court stated that, although neither the Act nor section 104-13 of the Code conferred a right to a fitness hearing in postconviction proceedings, trial courts are nevertheless obligated to consider whether a postconviction petitioner is mentally competent to consult with counsel. *Id.* at 367. In reaching this holding, the court explained that section 122-4 of the Act, which governs the appointment of postconviction counsel, and Illinois Supreme Court Rule 651 (eff. July 1, 2017) work in conjunction "to ensure that post-conviction petitioners in this State receive a reasonable level of assistance by counsel in post-conviction proceedings." *Id.* at 359. Neither section 122-4 of the Act nor Rule 651 are "satisfied where appointed counsel is unable to consult with or communicate with a postconviction petitioner because the petitioner suffers from a mental defect." *Id.* at 361-62. Indeed, if the petitioner is incapable of rationally communicating with his or her appointed counsel, "the appointment of an attorney is but an empty formality." *Id.* at 360.

¶ 56 The *Owens* court further stated that, where a trial court finds a *bona fide* doubt as to a defendant's mental ability to communicate with counsel during postconviction proceedings, "the court may order that a psychological evaluation be conducted and consider the matter in an evidentiary hearing." *Id.* at 365. The trial court must then "determine whether a petitioner is competent to consult with his appointed counsel." *Id.* In other words, even though a fitness hearing is not expressly authorized in postconviction proceedings, section 122-4 of the Act and Rule 651, in tandem, require one when the court finds "a *bona fide* doubt as to the petitioner's mental ability to communicate with his post-conviction counsel." *Id.* at 362.

¶ 57 On the issue of a defendant's ultimate fitness, *Owens* emphasized that the context in which the issue arises is important, because "a greater degree of incompetence must be shown to demonstrate that a petitioner is not competent to participate in post-conviction proceedings than is

required to show that a defendant is not competent to stand trial." *Id*. at 363. This is so because of the "disparate nature of the two proceedings." *Id*. During a defendant's criminal trial, he "is confronted with the prosecutorial forces of organized society." *Id*. Conversely, postconviction proceedings occur after guilt has been determined, are civil in nature, and reflect a collateral attack on the conviction. *Id*. Indeed, "[a] post-conviction petitioner does not make his claim of incompetency against a clean slate." *Id*. at 362. The court went on to explain that a defendant is unfit for trial if he is "unable to understand the nature and purpose of the proceedings against him or to assist in his defense." *Id*. at 357. A postconviction petitioner is unfit, however, "only if he demonstrates that he, because of a mental condition, is unable to communicate with his post-conviction counsel in the manner contemplated by section 122-4 of the Code *** and *** Rule 651." *Id.* at 363. Further, *Owens* stressed that the right to counsel at trial is guaranteed by the sixth amendment to the constitution, whereas the right to counsel in postconviction proceedings is a matter of legislative grace. *Id*. at 364. "Counsel are appointed to represent post-conviction petitioners, not to protect them from the prosecutorial forces of the State, but to shape their complaints into the proper legal form and to present those complaints to the court." *Id*. at 364-65. Appointed counsel in postconviction proceedings therefore are required to provide only a reasonable level of assistance. *Id*. at 364.

¶ 58    In *Johnson*, 191 Ill. 2d 257, our supreme court revisited the issue of a defendant's fitness to proceed with postconviction proceedings and held that, in the postconviction context, just as at trial, a defendant has the initial burden of raising a *bona fide* doubt concerning his fitness. Once a *bona fide* doubt is created, however, the burden shifts to the State to prove the defendant is fit. *Id.* at 269; *People v. Pitsonbarger*, 205 Ill. 2d 444, 474 (2002).

¶ 59     In the instant matter, defendant was presumed fit at the outset of the postconviction proceedings.  See *Owens*, 139 Ill. 2d at 362; See also *People v. De La Paz*, 204 Ill. 2d 426, 440 (2003).  Again, "a defendant is considered unfit to proceed with the post-conviction process when, because of a mental condition, he cannot communicate his allegations of constitutional deprivations to counsel, thus frustrating his entitlement, under the Act, to a reasonable level of assistance."  *Johnson*, 191 Ill. 2d at 269.  If a defendant is competent to communicate his allegations of constitutional deprivations to his appointed counsel, the defendant is competent to participate in the postconviction process.  *Id*. at 270.

¶ 60     As discussed above, the trial court expressly found a *bona fide* doubt as to defendant's fitness because defendant insisted that he was not James Zoph, but rather, an individual named James Samuel Webb, who was abducted as a child in Australia and trafficked to the United States by Margo Petterson, who later assumed the identity of Betty Zoph.  The court emphasized in its written order that defendant "refused to speak to [his appointed postconviction counsel regarding] any issues other than his abduction and asking counsel to investigate markings on [*sic*] scars on Betty Zoph's body to establish that she abducted him.  He would not discuss his post-conviction petition."  Once the court found a *bona fide* doubt as to defendant's fitness to proceed with postconviction proceedings, the presumption of fitness was rebutted, and the burden shifted to the State to prove him fit.  See *Johnson*, 191 Ill. 2d at 271.  Although the trial court ordered a fitness examination as contemplated in *Owens*, it thereafter failed to hold a fitness hearing, make a judicial determination as to defendant's ultimate fitness for postconviction proceedings, or even read the fitness examination report.  Concerning the State, it made no attempt to satisfy its burden of proof that defendant was fit following the finding of *bona fide* doubt, as contemplated in *Johnson*.  Thus, the proceedings that occurred after the court expressly found a *bona fide* doubt did not comport

with *Owens* and *Johnson*. Because the court found a *bona fide* doubt, it was obligated to determine whether defendant was competent to consult with his appointed counsel and communicate his allegations of constitutional deprivation. *Owens*, 139 Ill. 2d at 365. The court failed to do so and, as a result, the record reflects the court's still-unresolved *bona fide* doubt regarding defendant's fitness.

¶ 61    Although it is not entirely clear from the record, it appears that the trial court either accepted what was, in essence, a stipulation that defendant was fit, or it allowed postconviction counsel to waive the issue. On that basis, the State argues that, even if the trial court erred in failing to rule on defendant's ultimate fitness, postconviction counsel invited the error. Under the invited error doctrine, a party may not request to proceed in one manner and then argue on appeal that the requested action was error. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). "The rationale for the rule is that it would be manifestly unfair to grant a party relief based on error introduced into the proceedings by that party." *Gaffney v. Board of Trustees of Orland Fire Protection District*, 2012 IL 110012, ¶ 57.

¶ 62    In this case, at the status hearing following defendant's fitness examination, postconviction counsel informed the court that Dr. Latham was of the opinion that defendant was fit. The court then inquired as to how postconviction counsel wished to proceed, and she responded by requesting a continuance to work on an amended postconviction petition and "move forward." The State emphasizes that postconviction counsel thereafter filed an amended petition and a certificate pursuant to Rule 651(c), and it argues that these acts "signaled to the court that [postconviction counsel] wanted to continue with the postconviction proceedings *** rather than wait for the court to conduct a fitness hearing."

¶ 63    The State's argument is not well taken because, in the face of the trial court's unresolved *bona fide* doubt of defendant's fitness, neither a *de facto* stipulation that defendant was fit, nor a purported waiver, was sufficient to establish defendant's fitness in the absence of an independent determination by the trial court. In reaching this determination, we are guided by cases involving the similar issue of fitness to stand trial.

¶ 64    In *People v. Contorno*, 322 Ill. App. 3d 177 (2001), the trial court found a *bona fide* doubt as to the defendant's fitness to stand trial and appointed an expert to evaluate him. *Id*. at 178. At a hearing following the examination, the parties stipulated that the expert concluded the defendant was fit. *Id*. The court then stated that it would "show pursuant to stipulation then [that the expert] finds the defendant fit to stand trial." *Id*. The matter of defendant's fitness was not addressed again, and the matter was not raised in a posttrial motion. On appeal, we concluded that the fitness hearing was deficient because the court merely accepted the expert's ultimate conclusion, and the record lacked any indication that the trial court conducted its own analysis of the expert's opinion or exercised any discretion in resolving the issue. *Id*. at 179. We made clear that the court "must analyze and evaluate the basis for an expert's opinion instead of merely relying upon the expert's ultimate opinion." *Id*. In other words, the ultimate issue of a defendant's fitness is for the trial court to decide, and not an appointed expert.

¶ 65    To be sure, *Contorno* involved a consideration of fitness to stand trial, which is an issue of constitutional dimension. See *Contorno*, 322 Ill. App. 3d at 179. Here, we confront the issue of fitness for postconviction proceedings under the Act, which provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred at trial. See *Edwards*, 2012 IL 111711, ¶ 21. Nevertheless, the rationale applies with equal force here. Despite the differing context in which the instant matter arises, we believe that the trial court,

as in *Contorno*, was obligated to exercise its discretion and resolve its *bona fide* doubt rather than blindly accept a stipulation that defendant was fit or allow defendant to waive the issue.

¶ 66    The purpose of the Act is to provide a statutory mechanism for incarcerated defendants to assert that they have been unconstitutionally deprived of their liberty. The reasonable assistance of counsel "necessarily follows from the nature and purpose of the Act." *People v. Johnson*, 2018 IL 122227, ¶ 17. The Act contemplates the filing of only one postconviction petition. *Edwards*, 2012 IL 111711, ¶ 21. Once a defendant is provided counsel for postconviction proceedings, that process relies heavily on the defendant being capable of communicating his or her claims to counsel. If, in this case, defendant was truly not competent to communicate his allegations of constitutional deprivation to his counsel, then the trial court's passive acceptance of a fitness stipulation ran a serious risk of depriving him of both his statutory right to the reasonable assistance of counsel and his only opportunity to seek collateral relief under the Act. See *Johnson*, 191 Ill. 2d at 272 ("[I]t would be a 'strange rule,' indeed to impose upon a defendant the burden of proving unfitness to proceed with a post-conviction petition where the very disability the defendant seeks to prove may very well render the defendant incapable of sustaining the burden of proof"). See also *Owens*, 139 Ill. 2d at 359-60 (the Act cannot serve its purpose unless counsel ascertains the basis of the petitioner's complaints, shapes them into appropriate legal form, and presents them to the court. If counsel is unable to ascertain whether the petitioner has viable claims because the petitioner suffers from a mental defect affecting his ability to communicate rationally, then the appointment of an attorney is but an empty formality). Put simply, it would be incongruous to allow a party in whom the court has an unresolved *bona fide* doubt as to their postconviction fitness to then waive further inquiry into the matter or stipulate that they are, in fact, fit. The Act provides a statutory right to a reasonable level of assistance of counsel. To implement that right, the

defendant must be fit. Where the court has a *bona fide* doubt as to a defendant's fitness, the trial court must be satisfied that he or she is fit, and it must make an express finding on the record before proceeding further. Here, because the court found a b*ona fide* doubt as to defendant's fitness for postconviction proceedings, it was improper for it to abdicate its obligation to rule on defendant's ultimate fitness for postconviction proceedings. Under these circumstances, application of the invited error doctrine would be inappropriate.

¶ 67    For similar reasons, we decline the State's invitation to find that the trial court's failure to rule on defendant's fitness for postconviction proceedings may be excused on the basis of harmless error. The State emphasizes that Dr. Latham's report, which "recommended the Court find [defendant] fit to proceed," was known to the trial court and is included within the record on appeal. It argues that if the trial court had held a hearing on defendant's postconviction fitness, it would have been presented with Dr. Latham's testimony that defendant was fit. The State's argument implies that we may conclude that defendant was fit for postconviction proceedings following our own independent review of the report, notwithstanding the trial court's failure to do so. As noted by defendant, if we were to take the State up on its offer, we would be the first court to review the report, because the record affirmatively shows that the trial court did not review it. We decline to, in essence, hold a hearing of our own on defendant's fitness based only on information that may be gleaned from the record. The trial court is in a superior position to observe defendant and evaluate his conduct and ability to communicate with his appointed counsel. Because the trial court found a *bona fide* doubt of defendant's fitness, it must resolve it.

¶ 68    As a final matter, the State asserts that if we agree with defendant that remand is required, we should remand the cause for a retrospective fitness hearing rather than remand for new postconviction proceedings. Defendant responds that a retrospective hearing would be

inappropriate given that approximately three years have passed since the trial court found a *bona fide* doubt. Instead, defendant asks that we "remand the cause for a contemporaneous fitness examination and new proceedings on the post-conviction petition."

¶ 69    In the context of cases involving fitness to stand trial, our supreme court previously stated that a retrospective fitness hearing would typically be inadequate when more than one year has passed since the defendant's original trial and sentencing. *People v. Neal*, 179 Ill. 2d 541, 554 (1997).   However, subsequent to *Neal*, the Illinois Supreme Court stated that "it appears that retrospective fitness hearings are now the norm.  What was constitutionally forbidden three years ago is now compelled." *People v. Mitchell*, 189 Ill. 2d 312, 339 (2000).   Indeed, the *Neal* court acknowledged that, in certain instances, the issue of a defendant's fitness or lack thereof may be fairly and accurately determined long after the fact, and the issue may be analyzed on a case-by-case basis. *Neal*, 179 Ill. 2d at 554.

¶ 70    Despite the length of time that has elapsed since the trial court found a *bona fide* doubt, we agree with the State that the appropriate remedy is to remand for the trial court to conduct a retrospective hearing on defendant's postconviction fitness.  Two considerations lead us to this conclusion.  First, defendant does not contend on appeal that he was unfit for postconviction proceedings.  Instead, he focuses his appeal on the trial court's failure to rule one way or the other on his fitness.  Second, at the hearing on August 17, 2020, the parties essentially stipulated to Dr. Latham's report, which was the only evidence presented.  A retrospective hearing will allow the court an opportunity to actually review the fitness examination report, relevant reports of proceedings, hear from witnesses, and determine whether defendant was fit for postconviction proceedings.  See *People v. Cook*, 2014 IL App (2d) 130545, ¶ 22 (ordering a retrospective fitness

hearing where the parties stipulated to the report and stating the trial court was "perfectly capable of reviewing that evidence and finding whether, in light of that evidence, defendant was fit)."

¶ 71    Based on the above, we remand for the limited purpose of conducting a retrospective fitness hearing and determining whether defendant was fit for postconviction proceedings on July 22, 2020, which is when the court made an express finding of *bona fide* doubt. On remand, the court should be mindful that the level of competency required in postconviction proceedings is less than that required at trial, as "a defendant is considered unfit to proceed with the post-conviction process when, because of a mental condition, he cannot communicate his allegations of constitutional deprivations to counsel, thus frustrating his entitlement, under the Act, to a reasonable level of assistance." *Johnson*, 191 Ill. 2d at 269. Once the trial court conducts a retrospective fitness hearing and expressly determines whether defendant was fit, it shall certify the record arising from those proceedings, and we shall resume our consideration of the issues raised in this appeal. If necessary, we will allow the parties to file supplemental briefs to address any issues that may arise from the limited remand for a retrospective fitness hearing.

¶ 72                    III. CONCLUSION

¶ 73    For the reasons stated, this cause is remanded with directions for the limited purpose of conducting a retrospective fitness hearing and expressly determining whether defendant was fit for postconviction proceedings. After holding the hearing, the trial court shall deliver to the clerk of this court, within 120 days of this decision, a report of its findings concerning defendant's postconviction fitness and a report of the proceedings on remand.

¶ 74    Cause remanded with directions.