2024 IL App (2d) 220123-UB
No. 2-22-0123
Order filed September 20, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04-CF-2440 |
| JAMES E. ZOPH, | ) ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice McLaren and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Following a limited remand for the trial court to conduct a retrospective fitness hearing, we determine that the court did not abuse its discretion in finding that defendant was fit for postconviction proceedings. Additionally, the court did not err in dismissing defendant's postconviction petition at the second stage of proceedings because he failed to make a substantial showing that trial counsel was ineffective.

¶ 2    This postconviction matter returns to us following a limited remand for the trial court to conduct a retrospective fitness hearing and to expressly determine whether defendant, James E. Zoph, was fit for postconviction proceedings. On remand, the court conducted such a hearing and answered that question in the affirmative. Defendant has filed a supplemental brief challenging

that determination. Accordingly, we are called upon to review that determination, as well as the issue that remained unresolved following our limited remand—namely whether the court erred in dismissing defendant's postconviction petition at the second stage of proceedings. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     We thoroughly recounted the facts of this case in defendant's direct appeal, *People v. Zoph*, 381 Ill. App. 3d 435 (2008) (*Zoph I*) and his appeal of the trial court's second-stage dismissal of his postconviction petition, *People v. Zoph*, 2023 IL App (2d) 220123-U (*Zoph II*). To give context to the instant appeal, which is an extension of *Zoph II*, we summarize the facts as previously expressed in those dispositions, but we will add additional detail as needed to resolve the issues defendant raises in this appeal.

¶ 5     On June 29, 2004, in Zion, Illinois, defendant's aunt, Wanda Walker, was found dead in the home that she shared with her sister, defendant's adoptive mother, Betty Zoph. Zoph adopted defendant when he was about eight years old, and defendant lived in her home until about 1995, when he was in his mid-20's. Defendant had visited the house after he moved out but, as of the time of the murder, defendant had not visited the home in "years." At the time of her death, Walker was a 66-year-old woman who was physically disabled. She was discovered on the floor in the basement of her split-level home. The autopsy revealed that Walker had bleeding in her brain, as well as fractures to her jaw, hyoid bone in her neck, and eight ribs. Walker also showed signs of strangulation and had extensive bruising on her face and neck. The bruising on her face resembled a shoe print. The pathologist concluded that blunt-force trauma caused Walker's death.

¶ 6     Police arrived at the scene in response to an alarm from the home's security system. Glass from the basement window had been removed, apparently to frustrate the security system. Above the window was a smudged palm print, which did not match defendant or anyone in the home. A

sliding glass door was slightly ajar, which the police used to gain initial entry into the home. The toilet in the basement had a wad of toilet tissue in the bowl, above the water, and defendant's DNA was present on the tissue. The toilet seat was up, and urine was in the toilet. On June 30, 2004, at approximately 12:30 a.m., defendant was arrested while he attempted to steal a vehicle from a used car lot in Winthrop Harbor. Following a custodial interrogation that morning, defendant was charged with eight counts of first-degree murder in connection with Walker's death.

¶ 7                                    A. Motion to Suppress Statements

¶ 8      Defendant, through appointed counsel, filed a motion to suppress statements. Defendant alleged that, on June 30, 2004, he was taken into custody by the Lake County Sheriff's Office and was interrogated over a period of 12 hours, during which he neither waived his right to remain silent nor his right to counsel. Additionally, defendant alleged that he explicitly invoked his right to counsel "repeatedly," but the requests were "denied on each occasion."

¶ 9      At the hearing on the motion to suppress, City of Waukegan police officer Charles Schletz, who was also an investigator with the Lake County Major Crimes Task Force (Task Force), testified as follows. On June 30, 2004, at approximately 2:00 a.m., he learned that defendant had been arrested for burglary to a motor vehicle and was in the custody of the Winthrop Harbor police department. Schletz and City of Zion police officer Kevin Harris, who was also an investigator with the Task Force, met at the Winthrop Harbor police station and arranged for defendant to be transported to the sheriff's office for questioning. Defendant arrived at the sheriff's office at about 4:15 a.m. and was placed in an interview room.

¶ 10      At 4:45 a.m., Schletz and Harris entered the interview room and asked defendant general questions to verify his identity. Defendant initially did not respond to their questions, and he looked around the room for several minutes. Schletz also informed defendant that they were

investigating Walker's death.  Harris read defendant his *Miranda* rights from a preprinted form.  Defendant did not say anything at first but, about a minute later, defendant turned to Schletz and said, "I understand my rights.  I've been living in hell for the past ten years."  Schletz gave defendant a written *Miranda* form, and defendant read and signed it.  For approximately the next two hours, defendant informed the investigators of his whereabouts over the previous several days.  Defendant denied being in Walker's house at the time of the murder.  They took a break from the interview, and defendant was provided with a breakfast sandwich and a cup of coffee.

¶ 11    Schletz and Harris resumed questioning defendant at around 9:00 a.m.  Schletz told defendant "about some of the evidence [they] had in the case, some of the things [they] learned in the case," and, after about 20 or 30 minutes, defendant admitted that he had been inside Walker's home and that he killed her.  Defendant's demeanor was "confident," and he "spoke clearly and [was] straightforward and very cooperative."  Defendant recounted the events of the murder until about 10:30 or 10:45 a.m.  At that point, defendant agreed to show the investigators where he disposed of some clothing that he wore when he killed Walker.

¶ 12    The investigators paused the interview and drove defendant past Walker's home.  Defendant instructed them where to go and showed them the route that he took from the home to a densely wooded area in Zion, where he disposed of the clothing.  The investigators arranged for evidence technicians to meet them, and defendant told the investigators where the evidence technicians should search.  Schletz did not attempt to have defendant's duffel bag recovered, because defendant reported that he had already returned to the area where he had left the bag, but the bag was gone.  Schletz and Harris then drove defendant back to the sheriff's office.

¶ 13    The interview resumed at approximately 11:30 or 11:45 a.m.  Schletz told defendant that they needed him to draft a written statement.  He told defendant that defendant could either write

the statement in his own handwriting or Schletz could type out what defendant had told them, and they could review it together to ensure that it was accurate. Defendant stated that he preferred to write a statement himself. Schletz handed defendant a form, which included *Miranda* rights and a multi-page, preprinted voluntary statement form with blank lines on it. Schletz read defendant his *Miranda* rights from the form, and defendant read, initialed, and signed it. Schletz wrote on the form that the "time started" was "12:00 p.m.," and defendant dated the statement form and wrote "12: PM" at the top. Schletz and Harris then left defendant alone in the interview room for about 20 or 30 minutes and, when they returned, defendant had produced a two-page, handwritten statement. Defendant signed the statement, and Schletz and Harris both signed the form as witnesses. Schletz asked defendant if he would agree to read the statement while being videotaped, but defendant declined. Schletz gave defendant a "Consent for Electronic Recording" form, and defendant indicated on the form that he did not authorize them to record his statement. The form indicated that defendant signed it at 1:00 p.m. Schletz testified that defendant did not ask to speak with an attorney or request to make a phone call at any point during the interview. Defendant also did not ask to speak with his wife, Michelle Tully. Schletz denied threatening defendant.

¶ 14    On cross-examination, Schletz testified that he did not ask defendant about an individual named "Leo Tully," but Schletz believed that he heard that name during the investigation, because defendant was related to him. Schletz also denied telling defendant that he wanted information regarding a murder that had occurred near a bar.

¶ 15    Harris provided testimony at the suppression hearing that was consistent with that provided by Schletz. Relevantly, Harris testified that defendant made his first statements indicating his involvement in Walker's death between 9:00 a.m. and 10:45 a.m., produced a written statement shortly after they returned from the wooded area in Zion, and that defendant refused to be

videotaped while reading his statement. On cross-examination, Harris testified that Schletz did not ask defendant any questions about a "Leo Tully," and that name was unfamiliar to Harris.

¶ 16    Defense counsel presented no evidence at the suppression hearing. Instead, in brief argument, counsel asked the trial court to find that defendant had invoked his sixth amendment right to counsel during his interview and to suppress defendant's statements.

¶ 17    The trial court denied the motion to suppress. It found that Schletz and Harris were credible, that defendant was advised verbally and in writing of his rights under *Miranda* and the United States Constitution, that defendant knowingly and intelligently waived those rights, and that there was no evidence that defendant ever sought to stop the interview or requested counsel. The court also commented that defendant "was cooperative throughout."

¶ 18                              B. Defendant's Trial and Direct Appeal

¶ 19    In September 2005, the cause proceeded to a jury trial. The State's evidence showed that defendant confessed to the murder during questioning by Schletz and Harris, who both testified at trial. Specifically, defendant told the investigators that he had arrived in the area a few days prior to investigate an inheritance from his father that defendant believed he was cheated out of. Defendant approached the house from the rear and removed a window to evade the security system. He entered the lower level of the home to look for some papers. When he entered, he wore black leather gloves and a black t-shirt with a Maltese cross on it, and he was carrying a duffel bag and tools. As defendant searched the basement, Walker confronted him. Defendant put Walker in a chokehold and, believing she had passed out, laid her on the floor. As he continued to search, Walker sat up, and defendant "instinctively" kicked her in the head, causing her to fall back to the floor. Defendant resumed his search, and Walker again sat up. Defendant then "panicked and lost

it." He "kicked her, choked her neck with one hand and stomped" on her face and chest until she stopped moving.

¶ 20     Defendant became frightened, so he gathered his tools in his duffel bag and fled, triggering the alarm. Defendant proceeded to Beulah Park, where he walked in circles to throw off any bloodhounds that the police might use to track him. In a wooded area, he discarded the t-shirt and gloves he had been wearing, and he discarded his duffel bag under some powerlines on the side of a road. In the evening, defendant visited a friend to get a screwdriver, and defendant told the friend that he had "a little bit of trouble going on." As defendant turned to leave, the friend said, "see ya," to which defendant replied, "no, not really. It won't be soon, but I will see you again someday." Defendant walked to a used car lot, where he attempted to steal a vehicle to leave town. He was apprehended while he sat in one of the vehicles.

¶ 21     During questioning, defendant offered to show the investigators where he discarded the t-shirt and gloves. The investigators arranged for evidence technicians to meet them, and they drove defendant to Beulah Park. Once there, defendant showed them the approximate area where he discarded the items. The investigators transported defendant back to the sheriff's office while the evidence technicians searched the area. As they drove, defendant pointed out the route that he had walked from Walker's house to Beulah Park. The evidence technicians eventually recovered a black t-shirt with a Maltese cross on it and a pair of black leather gloves in the woods.

¶ 22     When they returned to the sheriff's office, defendant agreed to provide a handwritten statement. The written statement, which was admitted into evidence, contained the same facts set out above. After defendant completed the written statement, the investigators asked defendant if he would read it while being videotaped, but defendant declined. Forensic testing showed that

Walker's blood was on the cuff of the pants defendant was wearing during the interview, and defendant's DNA was found on the tissue that was recovered from the toilet in Walker's home.

¶ 23    Defendant testified on his own behalf.  He denied any involvement in the murder. Specifically, he testified that at the time of the murder, he was "basically homeless" and was sleeping at various locations in the Lake County area.  On the morning of June 29, 2004, he had just returned from Indiana, and he went to his mother's house because he had nowhere else to go. He was wearing a grey shirt, blue jeans, and black athletic shoes.  Defendant was carrying a bag with clothes in it, including socks, a change of underwear, and a black t-shirt with a white Maltese cross on it.  Defendant testified that he approached the home from the rear alley and observed that a window and screen had been removed.  He climbed through the window and found Walker's body on the floor.  Defendant tried to find Walker's pulse, but she did not have one.

¶ 24    Defendant testified that he heard noises coming from upstairs, and he crept up a few stairs and "could see movement in [Walker's] room."  He became startled and then "bolted" out through the rear sliding glass door of the residence, which caused the security alarm to go off.  He did not contact the authorities because he feared that he would be blamed for the murder.  Defendant testified that he walked to Beulah Park, and thereafter spent the day at various locations in Winthrop Harbor.  He denied walking in circles around the park.  He purchased food at a convenience store and latex rubber gloves, which he intended to use to steal a vehicle that evening. He also visited a friend's house to borrow a large screwdriver, "because it's a great tool for peeling the column on a GM vehicle."  Defendant walked to a used car lot, where he was arrested while attempting to steal a truck. Defendant testified that he was still carrying his clothing bag when he was arrested, but he could not recall if his black t-shirt with a Maltese cross was still in the bag, because the last time he saw it was when he was in the woods at Beulah Park.

¶ 25    Defendant further testified that Schletz and Harris initially questioned him about his father-in-law, Leo Tully.  According to defendant, they inquired "as to some peculiarities about [Leo Tully's] residence and about a murder that had taken place across the street from [Leo Tully's] bar."  Defendant gave what "limited information" he had about that murder.  Eventually, Schletz and Harris asked defendant to write a statement implicating Leo Tully in Walker's murder.  Defendant began to write a statement against Leo Tully, but defendant changed his mind and "invoked [his] right to counsel."  The investigators responded that "that wasn't going to happen," and they "denied [defendant] access to anyone."  Defendant also requested to make a phone call, but he was denied.  The investigators threatened that if defendant did not implicate Leo Tully, they would make it look like defendant had murdered Walker.  That threat worried defendant because "nobody wants to be in that type of position, especially since [defendant] had been there," and he knew there "might be something," like physical evidence, to show that defendant was in Walker's home around the time of the murder.  Defendant testified that he reiterated his request for an attorney, but the investigators again refused.  They then took defendant to Beulah Park in an unmarked police vehicle.  When they arrived, Schletz opened the trunk of the vehicle and proceeded into the woods.  Defendant remained in the car and could not see what Schletz did in the trunk.  He could not tell if Schletz carried anything into the woods.  Schletz returned to the car about ten minutes later, and the investigators walked defendant into a field, stood with him there for three minutes, and drove him back to the sheriff's office.  Defendant testified that, when they returned to the interrogation room, Schletz continued to threaten him.  He told defendant that he was his only chance to avoid a death or natural life sentence.  Defendant asked what he would have to do to be allowed to make a phone call.  Defendant testified that he really wanted to speak with [his] wife, [Michelle Tully], who also [was] an attorney."  Schletz told him to "write the statement

that [Schletz] want[ed]," and defendant would be allowed to make a call. Defendant stated that he "failed creative writing," and so Schletz wrote a statement on a legal pad and instructed defendant to copy it. Defendant testified that he then copied the statement in his own handwriting onto an official statement form, because that was the only way to get Schletz "out of [his] face." Defendant proceeded to deny the pertinent details of the written statement. He acknowledged entering Walker's home through the window and subsequently traveling through Beulah Park, but he denied killing Walker. As far as he knew, his t-shirt was in his bag when he was arrested, but he agreed it was possible that he dropped it in Beulah Park as he was searching for something in the bag. He denied ever owning leather gloves.

¶ 26 During closing argument, the State summarized the evidence favorable to its case, with a strong focus on defendant's confession. Defendant's argument centered on his theory that Schletz and Harris pinned the murder on him and that Schletz instructed defendant what to write in the confession. Defendant also emphasized that the source of the smudged palm print above the basement window was never identified.

¶ 27 The jury found defendant guilty of first-degree murder of a person 60 years of age or older by exceptionally brutal or heinous behavior indicative of wanton cruelty. The trial court denied defendant's motion for a new trial and sentenced him to natural life imprisonment.

¶ 28 On direct appeal, defendant argued that he was deprived of a fair trial by several of the State's remarks during rebuttal closing argument and by the publication to the jury of certain gruesome photographs of the victim. We rejected both claims and affirmed defendant's conviction. *Zoph I*, 381 Ill. App. 3d 435.

¶ 29          C. Postconviction Proceedings and Subsequent Appeal

¶ 30   Defendant filed the first version of his *pro se* postconviction petition on May 14, 2008. Among other claims, he alleged that his statements to Schletz and Harris were taken in violation of his sixth amendment right to counsel because his wife, Michelle Tully, was at the sheriff's office, identified herself as defendant's attorney, and was denied access to him prior to defendant making any incriminating statements.

¶ 31   Between the filing of his first *pro se* petition and February 4, 2015, defendant filed 19 amended *pro se* supplemental postconviction petitions.  In his February 4, 2015, supplemental postconviction petition, defendant stated that he made "a good faith effort to exercise due diligence" and "made several *pro se* supplemental amendments."  He further stated that he "is skizaphrenic [*sic*] and *** was not being treated with psychiatric medicine for this serious mental health condition and the pro-se amendments were made in a scatter-brained nature."  He thereafter purported to raise 21 separate constitutional violations.  Relevant to this appeal, defendant's April 29, 2010, amendment included a notarized affidavit from Michelle, executed March 3, 2010.  She averred that on June 30, 2004, at approximately 12:30 p.m., she arrived at the sheriff's office and "attempted to see [her] client, James E. Zoph," but she was "denied access to him."  She further averred that she "tried a few hours later and again was denied access."  She also called the sheriff's office later that evening but was given no information.

¶ 32   On April 6, 2015, the trial court entered an order stating that, although defendant's various petitions were "sometimes repetitive, sometimes contradictory, sometimes confusing, sometimes irrelevant and sometimes facially inaccurate," defendant nevertheless, "at times stated the gist of a constitutional claim." The court advanced the matter to the second stage of postconviction proceedings and appointed counsel for defendant.  Between 2017 and 2019, postconviction

counsel requested and received time to review the record and amend the petition, while defendant wrote letters to the court complaining about the representation.

¶ 33    On February 4, 2019, defendant requested and was allowed to proceed *pro se*. Then, on October 11, 2019, defendant filed another amended postconviction petition. That petition alleged that his trial counsel was ineffective for failing "to review information in Discovery to the effect that Michelle Tully, who was a licensed attorney, was interviewed at the Lake County Sheriff [*sic*] department at 1:30 p.m. on June 30th, 2004." Defendant attached Michelle's March 3, 2010, affidavit and a police report summarizing the interview.

¶ 34    On September 19, 2019, the trial court denied defendant's *pro se* motion for forensic testing. Then, on October 18, 2019, at defendant's request, the court reappointed counsel to represent defendant.

¶ 35    Between May and July 2020, defendant sent several letters to the court asserting that his true name was "James Samuel Webb," and that, in 1969, he was abducted in Australia by two women, Margot and Claudia Petterson. He further indicated that this information was "materially relevant" because Margot Petterson had assumed the identity of "Betty R. Zoph," defendant's adoptive mother, and had provided perjured testimony against him at his trial. He further stated that, to the best of his knowledge, Margot had "a warrant (out of Australia) for murder and kidnapping." Defendant lamented that his counsel refused to review or investigate this claim.

¶ 36    On July 22, 2020, counsel orally moved for a fitness evaluation. The trial court granted the request, made an express finding of *bona fide* doubt regarding defendant's fitness for postconviction proceedings, and appointed Dr. Anthony Latham to conduct a fitness evaluation.

¶ 37    Dr. Latham evaluated defendant on August 6, 2020, and filed his report with the court on August 17, 2020. In the report, Dr. Latham noted that defendant suffers from delusional disorder,

persecutory type, but that defendant nevertheless had the "capacity to assist defense counsel in the preparation of a postconviction petition." Dr. Latham recommended that the court find defendant "fit to proceed."

¶ 38     On August 18, 2020, at a status hearing, the parties informed the trial court of the results of the fitness evaluation. The court asked defendant's counsel what she wished to do, and counsel replied that she wanted to "move forward." The court did not hold a fitness hearing or rule one way or the other whether defendant was fit for postconviction proceedings.

¶ 39     On June 9, 2021, appointed counsel filed a "Supplemental Petition for Post-Conviction Relief." Counsel included a procedural history of the postconviction proceedings and raised two claims: (1) trial counsel was ineffective for failing to file a motion directing the State to run the fingerprints found above the window that the perpetrator apparently used to enter Walker's home through the Automated Fingerprint Identification System; and (2) appellate counsel was ineffective for failing to speak with defendant regarding his claims of error.

¶ 40     On October 26, 2021, the State moved to dismiss the petition. But, before that motion was heard, defendant sent the trial court a letter on December 13, 2021, requesting that his appointed counsel be discharged because the supplemental petition filed by counsel "grossly understate[d]" his constitutional claims. Defendant also stated his intention to file another *pro se* petition.

¶ 41     On January 6, 2022, the trial court granted defendant's request to discharge his counsel and again allowed defendant to represent himself.

¶ 42     Pertinent to this appeal, on January 28, 2022, defendant filed his final amended *pro se* postconviction petition. He raised two claims: (1) trial counsel was ineffective for failing to discover and introduce evidence at the hearing on his motion to suppress confession showing that defendant invoked his right to counsel during police questioning, and that Michelle was at the

sheriff's office and requested to see defendant as his attorney before defendant made any incriminating statements; and (2) trial counsel was ineffective for failing to request further forensic testing of certain evidence recovered at the crime scene. Defendant attached several exhibits, including a copy of Michelle's March 3, 2010, affidavit and an affidavit that defendant executed on January 3, 2022. In his affidavit, defendant averred that he entered Walker's house at the time of the murder and observed two individuals, Nick Vitruls and Mark Miller, attacking Walker, but defendant "blacked out" for two to three minutes. He stated that he had a history of "black-out spells" since his childhood. He further averred that, after he regained consciousness, he observed Walker on the floor. Defendant stated that, as he picked up Walker's broken eyeglasses from the floor, his pant leg accidentally brushed her right ear, which was bleeding. Defendant further averred that, during his interrogation on June 30, 2004, he requested an attorney at 7:00 a.m., 9:00 a.m., 11:00 a.m., and 12:00 p.m., but the requests were denied. Defendant further averred that he did not make any incriminating statements until 1:00 p.m., which is when he was coerced into copying the statement that Schletz had prepared.

¶ 43    At a hearing on February 2, 2022, defendant clarified that he was proceeding on his January 28, 2022, *pro se* postconviction petition, and no other.

¶ 44    On February 9, 2022, the State filed a motion to dismiss defendant's January 28, 2022, *pro se* petition. Concerning the first issue defendant raised, the State argued that, even if Michelle's affidavit was accurate, defendant had already waived his *Miranda* rights, given a full confession, and accompanied the police to Beulah Park before 12:30 p.m., which is when Michelle alleges in her affidavit that she arrived at the sheriff's office. Additionally, the State argued that Michelle's affidavit was directly refuted by a police report that defendant attached to his October 11, 2019, petition, which indicated Michelle was interviewed at the sheriff's office at 1:45 p.m. on June 30,

2004. It also emphasized that the affidavits were silent as to whether any of this information was communicated to defendant's attorney at the time of the trial. Concerning defendant's second claim, the State argued that any additional forensic analysis was predicated on his claim, made many years after trial, that he either saw two assailants attack Walker, or that he saw the assailants run away from the crime scene. The State stressed that defendant's theory contradicted his trial testimony and his postconviction petitions that he filed prior to 2015.

¶ 45    On February 17, 2022, after a hearing, the trial court granted the State's motion to dismiss defendant's first claim. Specifically, it determined that even if Michelle was at the sheriff's office at 12:30 p.m., defendant had already made the "most damaging" part of his statement and led the investigators to Beulah Park, where evidence of the murder was found. The court continued that, at best, Michelle arrived at the sheriff's office "near the end" of when defendant finished his written statement, and the "police are not required to stop everything they're doing because somebody who identifies themselves as an attorney is there." The court also attached significance to the timing of the production of Michelle's affidavit. The court found it "more important" that Michelle "did not apparently come forward with this" at the time of the trial, and there was no indication that she had told defendant's trial counsel, or defendant himself, that she attempted to speak with defendant during his interrogation. Turning to defendant's assertion that he should have testified at the suppression hearing, the court stated that eliciting defendant's testimony in that setting would not have aided his case because it "would have given the prosecutors a free shot at him before trial testifying to something potentially at least that's different" than his statements during interrogation. The trial court denied the State's motion to dismiss defendant's second claim, and that claim proceeded to a third-stage evidentiary hearing on March 2, 2022. On April 11, 2022, after a hearing, the court denied defendant's January 28, 2022, postconviction petition.

¶ 46    Defendant appealed, arguing that the trial court erred by (1) failing to hold a fitness hearing or rule on defendant's fitness for postconviction proceedings after it expressly found a *bona fide* doubt, and (2) dismissing the ineffective assistance claim at the second stage of proceedings. *Zoph II*, 2023 IL App (2d) 220123-U, ¶ 2. We agreed with defendant's first argument and remanded the matter with directions for the limited purpose that the court conduct a retrospective fitness hearing and expressly determine whether "defendant was fit for postconviction proceedings on July 22, 2020, which is when the court made an express finding of *bona fide* doubt." *Id*. ¶ 71. Because of that resolution, it was unnecessary to evaluate defendant's ineffective assistance claim. *Id*. We also indicated that the parties would be permitted to file supplemental briefs to address any issues arising from the limited remand, and that we would thereafter resume our consideration of the issues raised in the appeal. *Id*.

¶ 47                              D.  Retrospective Fitness Hearing

¶ 48    On October 10, 2023, the trial court held a retrospective fitness hearing pertaining to defendant's postconviction fitness. The parties stipulated that Dr. Latham was an expert in the field of forensic fitness evaluations and that he would testify consistently with the contents of his report, "with the qualification" that the parties be permitted "to ask some follow-up questions." The record confirms that the court reviewed the report prior to the hearing.

¶ 49    In the report, Dr. Latham noted that defendant "has been diagnosed with serious and persistent psychiatric disorder for nearly two decades per reviewed records," and that his "[d]iagnostic impressions of [defendant] include bipolar disorder, schizoaffective disorder, and delusional disorder." Concerning delusional disorder, persecutory type, Dr. Latham noted that "[t]his condition is often chronic and nonresponsive to traditional psychiatric intervention."

¶ 50    The report contains defendant's "background information," as described by defendant. Defendant responded to "Mr. Zoph" during the evaluation, but he insisted that his true name was "James Samuel Webb."  Defendant explained during the interview that he was born in Tasmania and was abducted in 1969 by Margot and Claudia Petterson, whom defendant believed were sisters or cousins.  Defendant reported that he never attended grade school, and that he was dropped off at an orphanage in Mexico by immigrants.  Defendant also stated that Margot Petterson was living under the assumed identity of Betty Zoph, who had provided perjured testimony against him at his trial.  Dr. Latham noted that "[d]elusional thought associated with delusional disorder is often specific or encapsulated to discrete experiences, such as [defendant's reported kidnapping]."  During the evaluation, Dr. Latham asked defendant to explain how this information, if accurate, was relevant to his postconviction petition.  Defendant "indicated it was not really[,] and that he would be fine if it was deemed irrelevant to his post-conviction proceedings related to obtaining DNA testing indicating Nick V and Mark M's DNA to be on this evidence."

¶ 51    In the "Summary of Clinical & Competency Interviews" portion of the report, Dr. Latham stated that defendant understood he was engaged in postconviction proceedings, and that the "petition is related to DNA testing of bloodstained carpet, bloodstained clothing, and hand or fingerprints for two men, Nick V. and Mark M."  Defendant insisted that these individuals, not him, murdered Walker, and that these matters were not "reviewed or discovered" during the trial. Dr. Latham also noted defendant's belief that "DNA blood and print evidence belonging to Nick V and Mark M will exonerate [defendant] of guilt for the murder of his aunt."

¶ 52    According to defendant, his counsel needed to file a petition for an investigation regarding defendant receiving ineffective assistance of counsel at his trial before she could seek the requested DNA testing.  Additionally, defendant reported that his counsel "refuses to work with him," and

there were "irreconcilable differences between them" because she "does not communicate" with him. Defendant expressed a desire to be assigned alternate counsel, and he complained at length regarding a "lack of responsiveness" from the various public defenders that represented him over the years.

¶ 53 Dr. Latham also detailed his impressions of defendant's understanding of the legal system. Defendant considered himself to be a "legal novice," and he described the judge as the "trier of fact" and "a fair and impartial referee obligated to look out for constitutional claims." Defendant stated that the role of the State was "to stick to their guns on the case with an obligation to serve justice." Dr. Latham noted that defendant offered a "suspect" view of the public defender's office, because he described it as "an extension of the State's Attorney's Office." Defendant also indicated that the judge would determine whether his postconviction petition "does or does not meet the burden of proof." Defendant noted that, at the time of the interview, he was at "stage two" of postconviction proceedings and, if he was successful in showing that he received ineffective assistance of counsel at his trial, the matter would proceed to "stage three," which is where he believed "the [DNA] testing he desires will occur." Defendant indicated that his desired outcome in the postconviction proceedings is to be granted a new trial or for "his sentence to be changed to time served as he does not care to be locked up in prison." Dr. Latham noted that defendant's "motivation is rational in this regard so he can be released from serving a life sentence." In the analysis section of the report, Dr. Latham opined that, despite defendant's condition, he "appear[ed] to have factual and rational appreciation of the roles of the judge and prosecution." He also noted that defendant's frustration with the assistance provided by his counsel showed that he was "aware [that] her role is to assist him in furthering his petition." Dr.

Latham also noted defendant's "clear history of blaming his defense counsel for undesired legal outcomes and not meeting with him as promised."

¶ 54 Dr. Latham ultimately recommended that the trial court find defendant "fit to proceed." He emphasized that defendant "did not present data suggesting he lacks the capacity to assist an attorney in the preparation of his *** postconviction petition," and defendant likewise "did not verbalize insistence that [counsel] investigate matters of his reported abduction by Ms. Betty Zoph * * * as a prerequisite condition to proceed with the post-conviction petition." He also noted that, despite defendant's insistence "that events or processes are in accordance with his desires," which may impact his ability to work cooperatively with others, defendant "appear[ed] to present capacity to assist defense counsel in the preparation of a postconviction petition."

¶ 55 Dr. Latham provided expert witness testimony at the retrospective fitness hearing consistent with his report. Specifically, he testified that, on August 6, 2020, he interviewed defendant via the Zoom videoconferencing application. Dr. Latham "administered a standard competency interview" to defendant, and defendant appropriately described the role of the judge and the State, as well as demonstrated an understanding of basic trial process. Dr. Latham testified that defendant's answers during the interview and his demeanor did not suggest an inability to assist his counsel if he chose to do so. Instead, defendant indicated that he had "irreconcilable differences" with his counsel, because she would not meet with him, and because "working with her [was] like pulling teeth." Dr. Latham further testified that defendant told him that, if counsel deemed defendant's background and family history irrelevant to his petition, then he would also agree that the information was irrelevant, and defendant "still could and would work with her."

¶ 56 However, Dr. Latham could not render an opinion regarding defendant's fitness as of the specific date of July 22, 2020, because he did not evaluate defendant until August 6, 2020. Dr.

Latham explained that he does not "automatically get the referrals or get the orders on those days," and "[t]here could be other sessions that [he has] scheduled." There typically is "a little bit of lead time to schedule an evaluation" for defendants whose fitness is called into question.

¶ 57 On cross-examination, Dr. Latham acknowledged that defendant's memories of childhood trauma appeared to be delusional, including his "firm" beliefs that (1) his true name was James Samuel Webb; (2) he was abducted from Australia in 1969 by Margot and Claudia Petterson; and (3) Margot Petterson assumed the identity of Betty Zoph. Dr. Latham also acknowledged that defendant's delusion regarding his true identity "correlates with his trial" because he believed his adoptive mother provided false testimony there. However, Dr. Latham opined that a person can be fit while harboring delusional beliefs, and that "delusional belief can coexist with a fairly competent understanding of the court system and process." He also reiterated defendant's statement that, if counsel told him that his childhood trauma was irrelevant to his postconviction petition, defendant would go along with that assessment. Dr. Latham's expert opinion was that defendant was fit for postconviction proceedings.

¶ 58 Defendant presented no evidence, testimony, or witnesses at the retrospective fitness hearing, and the trial court took the matter under advisement.

¶ 59 On December 5, 2023, the trial court announced its ruling. The court began by summarizing the proceedings and Dr. Latham's findings. It acknowledged that, in *Zoph II*, we remanded the matter for a retrospective fitness hearing to determine whether defendant was fit for postconviction proceedings as of July 22, 2020, which is the date that the court made an express finding of *bona fide* doubt. The court stated that it could not find that defendant was fit on that specific date based on the evidence presented, however, citing Dr. Latham's testimony that he could not opine on defendant's fitness as of that date because he did not have an opportunity to

evaluate defendant until August 6, 2020. The court went on to state that the analysis did not "end here," because the relevant question was whether defendant was fit for postconviction proceedings. The court expressly found that defendant was able to communicate with his counsel regarding his allegations of constitutional deprivations and, based on the evaluation performed by Dr. Latham and his testimony at the hearing, it found defendant fit for postconviction proceedings as of August 6, 2020. The court again noted our instruction in *Zoph II* that the court should evaluate defendant's postconviction fitness as of July 22, 2020, but it added that nothing "of legal significance occurred between [that date] and August 6, 2020, a period of 15 days." Specifically, there were "no court dates, no filings, [and] no evidence that the defendant or defense counsel conducted or attempted to conduct any communication or *** attempt[ed] to prepare any legal filings" during that period. The court included its findings in a written order entered that same day.

¶ 60 On January 4, 2024, this court entered an order allowing defendant to supplement the record on appeal with the report of proceedings from the retrospective fitness hearing, and it entered a supplemental briefing schedule permitting the parties to raise any issues arising from the limited remand.

¶ 61 Defendant, in this court, has filed a supplemental brief raising an additional claim challenging the trial court's finding that he was fit for postconviction proceedings. He requests that we reverse that finding and the trial court's order denying his postconviction petition, and that we remand the cause for new proceedings under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). The State has filed a supplemental brief in opposition.

¶ 62                 II. ANALYSIS

¶ 63 Defendant raises two broad issues in the instant matter. First, he contends that the trial court erred in finding him fit for postconviction proceedings following our limited remand and the

resulting retrospective fitness hearing. In the alternative, defendant argues that the court erred in dismissing his postconviction petition at the second stage of postconviction proceedings without an evidentiary hearing, because the well-pleaded facts in the petition, if accepted as true, make a substantial showing that he received ineffective assistance of counsel in litigating defendant's motion to suppress confession. We address these issues in turn.

¶ 64                                     A. Defendant's Postconviction Fitness

¶ 65    A criminal defendant is presumed fit to stand trial, to plead, and to be sentenced. 725 ILCS 5/104-10 (West 2022). The presumption of fitness continues into postconviction proceedings because, having been convicted and sentenced, the trial court necessarily must have been satisfied that the defendant was fit. *People v. Owens*, 139 Ill. 2d 351, 362 (1990). However, when there is a *bona fide* doubt of a petitioner's fitness to proceed with postconviction proceedings, the court may order that a psychological evaluation be conducted and consider the matter in an evidentiary hearing. *Id.* at 365. Indeed, section 122-4 of the Act and Supreme Court Rule 651 (eff. July 1, 2017), which governs appeals in postconviction proceedings, work in concert to "ensure that post-conviction petitioners in this State receive a reasonable level of assistance by counsel in post-conviction proceedings." *Owens*, 139 Ill. 2d at 358-59. Neither section 122-4 of the Act nor Rule 651 are "satisfied where appointed counsel cannot determine whether a post-conviction petitioner has any viable claims, because the petitioner's mental disease or defect renders him incapable of communicating in a rational manner." *Id.* at 359-60. If a petitioner is unable to rationally communicate with his counsel, then "the appointment of an attorney is but an empty formality." *Id.* at 360 (quoting *People v. Garrison*, 43 Ill. 2d 121, 123 (1969)).

¶ 66    In determining whether there is a *bona fide* doubt as to fitness, the trial court may "require a substantial showing of incompetency" before a postconviction petitioner is entitled to a

psychological evaluation or an evidentiary hearing. *Id*. at 362. The decision of whether a *bona fide* doubt has been raised is left to the court's sound discretion, because it is in the best position to observe the petitioner. *Id*. Once a *bona fide* doubt is raised as to a petitioner's fitness to proceed, the burden is on the State to prove that the petitioner is fit. *People v. Johnson*, 191 Ill. 2d 257, 271 (2000). If the court finds that the petitioner is unfit, he shall be remanded to the Illinois Department of Corrections until fit. *Owens*, 139 Ill. 2d at 365.

¶ 67    The level of competency required during postconviction proceedings is lower than that required for a defendant to stand trial. *Johnson*, 191 Ill. 2d at 269. A defendant is considered unfit to stand trial if he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. *Owens*, 139 Ill. 2d at 363. Conversely, a defendant is unfit for postconviction proceedings only when, because of a mental condition, he is unable to communicate his allegations of constitutional deprivations to counsel, thus frustrating his entitlement, under the Act, to a reasonable level of assistance. *Johnson*, 191 Ill. 2d at 269. Indeed, "a greater degree of incompetence must be shown to demonstrate that a petitioner is not competent to participate in post-conviction proceedings than is required to show that a defendant is not competent to stand trial." *Owens*, 139 Ill. 2d at 363.

¶ 68    The lower level of competency required for postconviction proceedings, as compared to trial, reflects critical differences between these types of proceedings. *Johnson*, 191 Ill. 2d at 269-70. At a criminal trial, "a defendant is confronted with the prosecutorial forces of organized society and immersed in the intricacies of the substantive and procedural law," whereas postconviction proceedings are initiated by the defendant, represent a collateral attack on the conviction, and are civil in nature. *Owens*, 139 Ill. 2d at 363. The role of a defendant's counsel varies between these proceedings, as well. "[I]n proceedings under the Act, counsel is appointed not to shield a

defendant from the 'prosecutorial forces' of the State, but to shape a defendant's claims into the appropriate legal form for presentation to the court." *Johnson*, 191 Ill. 2d at 270. Additionally, the right to the assistance of counsel at trial is derived from the United States Constitution, whereas counsel in postconviction proceedings is a matter of legislative grace that may be altered by the legislature at will. *Owens*, 139 Ill. 2d at 364. Postconviction petitioners are thus entitled only to a statutory "*reasonable* level of assistance." (Emphasis in original). *Id*. A reviewing court will reverse the trial court's finding that a defendant is fit for postconviction proceedings only if the court abuses its discretion. *People v. Shum*, 207 Ill. 2d 47, 62 (2003). A court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Zelenak*, 2014 IL App (3d) 120639, ¶ 14.

¶ 69 In his supplemental brief, defendant initially argues that the trial court abused its discretion in finding that he was fit for postconviction proceedings because the State presented no evidence that he was fit as of the specific date of July 22, 2020—which is the date that we referenced in our prior disposition. *Zoph II*, 2023 IL App (2d) 220123-U, ¶ 71. We previously remanded the cause "for the limited purpose of conducting a retrospective fitness hearing and determining whether defendant was fit for postconviction proceedings on July 22, 2020, which is when the court made an express finding of *bona fide* doubt." *Id*. Defendant points to Dr. Latham's testimony that he could offer no opinion on defendant's postconviction fitness as of July 22, 2020, because he did not have an opportunity to conduct the evaluation until August 6, 2020. According to defendant, because the State bore the burden of proving defendant was fit (see *Johnson*, 191 Ill. 2d at 271), the absence of any evidence supporting a finding of fitness on that precise date obligated the court to find that defendant was unfit.

¶ 70    This argument fails.  Defendant's position, in essence, is that the trial court abused its discretion by basing its determination strictly on the evidence presented at the retrospective fitness hearing.  An abuse of discretion generally occurs when a trial court does *not* base its ruling on the evidence.  See *People v. McDonald*, 2016 IL 118882, ¶ 32 (stating "an abuse of discretion occurs where the court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it").  Dr. Latham testified clearly that, in his expert opinion, defendant was fit to proceed with postconviction proceedings as of August 6, 2020—which is the date that he evaluated defendant.  This evidence supports the court's fitness finding.

¶ 71    Defendant makes no argument that the trial court either exceeded the scope of our mandate or failed to follow it in evaluating defendant's fitness as of August 6, 2020, as opposed to July 22, 2020.  Instead, he apparently relies on the State's burden of persuasion in conjunction with the absence of evidence regarding defendant's fitness during the roughly two-week period between the date the trial court found a *bona fide* doubt and the date that Dr. Latham evaluated defendant.  Even if we agreed with defendant that he was presumptively unfit during this two-week period, we can discern no prejudice accruing to him from the court's fitness finding.  As the court astutely pointed out, there is no indication that anything of significance occurred between July 22, 2020, and August 6, 2020; there were no court dates or filings by any party, and there is no evidence that defendant or defense counsel conducted or attempted to conduct any communication or attempted to prepare any legal filings during this period.  Defendant's argument also overlooks that one of our express purposes for remanding the matter was to give the court "an opportunity to actually review the fitness examination report."  *Id*.  ¶ 70.  Defendant's argument, if given full consideration, would fault the trial court for even considering Dr. Latham's report because it was prepared based on an evaluation of defendant that postdates July 22, 2020, and we therefore reject

it. The court correctly recognized that the matter was "remanded with directions for the limited purpose of conducting a retrospective fitness hearing and expressly determining whether defendant was fit for postconviction proceedings." *Id.* ¶ 72. The record confirms that the court did just that.

¶ 72 Defendant argues, alternatively, that even if the trial court was correct that the relevant question on remand was whether he was fit for postconviction proceedings, the court's ultimate ruling constituted an abuse of discretion. We reject this argument, too, because there is ample evidence to support the court's determination that defendant satisfied the standard of fitness applicable to postconviction proceedings.

¶ 73 Dr. Latham detailed defendant's long history of serious and persistent psychiatric disorders—which included bipolar disorder, schizoaffective disorder, and delusional disorder—in his report and at the retrospective fitness hearing. He explained that delusional thought associated with delusional disorder often manifests as specific and discrete experiences, and he opined that defendant's self-reported kidnapping from Australia when he was a child was one such example. Defendant conceded that his reported abduction was "not really" relevant to the postconviction proceedings and that he would agree to put the issue aside if his counsel deemed the issue irrelevant. Additionally, Dr. Latham reported that defendant did not insist that his counsel investigate the reported abduction as a precondition to proceeding with the postconviction process, and defendant stated that if his counsel told him that it was irrelevant to the instant proceedings, he would go along with that assessment.

¶ 74 Dr. Latham opined that, regardless of defendant's delusions regarding his personal history, defendant was fully capable of putting those delusions aside, communicating his allegations of constitutional deprivation to his counsel, and assisting counsel in the postconviction process.

According to Dr. Latham, defendant presented nothing to suggest that he lacked the capacity to assist counsel in the preparation of a postconviction petition.

¶ 75    Defendant also demonstrated more than a foundational grasp of the postconviction process, in that he recognized that he was at the second stage of proceedings, and he appropriately described the role of the judge and the prosecutor.  Despite having a "suspect" view of the public defender's office, defendant recognized that the role of his counsel was to assist him in those proceedings, which he hoped would result in a new trial.  Defendant also believed that, if his postconviction petition was successful, he could pursue testing of certain blood stains and fingerprints found at the scene, which defendant believed would exonerate him.   Dr. Latham's testimony was clearly sufficient to sustain the State's burden of proving defendant was able to communicate his allegations of constitutional deprivation to his counsel which, again, is a lower standard of fitness than is required to stand trial (*Owens*, 139 Ill. 2d at 363), and we cannot say that no reasonable person would agree with the trial court's decision to credit that testimony.

¶ 76    Defendant argues in his supplemental brief that the trial court abused its discretion in finding him fit for postconviction proceedings because his delusional disorder colored his actions throughout those proceedings.   In making this argument, defendant engages in an extended discussion of his initial postconviction petition and the numerous supplemental petitions that he filed between 2008 and 2022, and he highlights numerous factual inconsistencies between them regarding who and what he observed at Walker's house on the day of the murder.  These "ever-shifting beliefs," according to defendant, demonstrate that he was unable to accurately recall pertinent events of the case and caused him to insist that his counsel pursue testing of fingerprint and blood evidence that his counsel did not believe would yield beneficial results.

¶ 77    Specifically, defendant begins by discussing his various *pro se* petitions filed between 2008 and 2015.  He emphasizes that, in his initial petition, he focused on his trial counsel's failure to investigate defendant's uncle, James Walker, who defendant believed embezzled money from a life insurance policy that belonged to defendant's father.  Defendant also asserted that a witness observed James and Nick Vitruls near Walker's home on the day of the murder.  Defendant remarks that later-filed *pro se* petitions either suggested or directly asserted that James and Vitruls murdered Walker, which conflicted both with his statement to the investigators that he killed Walker himself and his trial testimony that he did not see who killed her.  In these subsequent postconviction petitions, defendant indicated that the desired forensic testing of the blood and fingerprint evidence found at the scene would exonerate him and implicate James and Vitruls.  Defendant also notes that, in some of his supplemental petitions, he alleged that he entered Walker's home, found her body, and then saw James and Vitruls flee the house but, in other filings, he asserted that he entered the house and witnessed James and Vitruls kill Walker.  In defendant's final supplemental filing before counsel was appointed in 2015, he referred to himself as a "skizaphrenic [sic]" and asserted that he was not receiving the proper medication.  He reiterated that an analysis of the blood found at the scene would be exculpatory, but he did not mention James, Vitruls, or the alleged embezzlement of life insurance proceeds.

¶ 78    Defendant continues in his supplemental brief that, after counsel was appointed in 2015, his filings suggested that his delusional beliefs evolved and became more pronounced.  Specifically, defendant filed a "supplemental affidavit" asserting that he saw Vitruls flee the home—not with James—but with petitioner's cousin, Mark Miller, who "bears a very striking resemblance" to James.  He also notes that counsel prepared an amended postconviction petition in 2018, but defendant was "not satisfied" with it because it did not address the requested forensic

testing. Defendant thereafter discharged his counsel and proceeded *pro se* for several months, during which he unsuccessfully attempted to obtain the testing. Counsel was later reappointed, and defendant wrote a series of letters to the court complaining about counsel's representation and insisting that defendant was actually "James Samuel Webb," an individual who was abducted from Australia in 1969, and that one of his abductors assumed the identity of Betty Zoph—defendant's adoptive mother. Defendant continues that, after he was evaluated by Dr. Latham and the court allowed defense counsel to essentially waive or stipulate to the issue of defendant's fitness, counsel filed a supplemental petition that "indulge[d] the [defendant's] delusional beliefs" by alleging trial counsel was ineffective for failing to seek the testing that defendant desired. He notes that, "even with that indulgence," defendant discharged his counsel yet again, "because she did not indulge [defendant's delusional beliefs] enough, thus losing any assistance from [counsel] at all."

¶ 79     Against this backdrop of "ever-shifting beliefs," defendant argues in his supplemental brief that Dr. Latham erred in his analysis because he failed to recognize that defendant had not one, but two distinct sets of delusional beliefs: (1) defendant's belief regarding his true identity and alleged kidnapping, and (2) defendant's belief that he observed Vitruls and Miller at the crime scene. In defendant's view, when he told Dr. Latham that he would put his beliefs aside regarding his purported kidnapping if counsel deemed the issue irrelevant, defendant was not expressing a willingness to cooperate in the preparation of a postconviction petition, but rather, he was "expressing his understanding that one set of his delusional beliefs was more closely related to the events at issue in this case than was another set of delusional beliefs."

¶ 80     Defendant's argument, at its core, is that the constitutional claims that he wished to raise in his postconviction petition were clearly delusional, and the trial court therefore abused its discretion in finding him fit to proceed. This argument fails because it overlooks the standard that

courts are to measure fitness against in the postconviction context. Again, a postconviction petitioner is unfit only when, because of a mental condition, he is unable to communicate his allegations of constitutional deprivations to counsel. *Owens*, 139 Ill. 2d at 363. The ability to competently communicate one's claims of constitutional deprivation to appointed counsel is the sole consideration—not the viability or likelihood of success of a petitioner's specific allegations. Indeed, a postconviction petitioner "may be competent to participate in post-conviction proceedings even though his mind is otherwise unsound." *Id.* at 362.

¶ 81 Defendant offers no argument to explain how his shifting recollection of the pertinent events of this case impacted his ability to communicate with appointed counsel or otherwise made such communication impossible. To the contrary, the record demonstrates that defendant was able to communicate his alleged constitutional deprivations to appointed counsel because counsel ultimately raised his specific contentions in a supplemental postconviction petition. As our supreme court has explained, the Act "contemplates that the attorney appointed to represent an indigent petitioner would consult with him either by mail or in person, ascertain his alleged grievances, examine the record of the proceedings at trial and then amend the *pro se* petition so that it would adequately present the prisoner's constitutional contentions." *Owens*, 139 Ill. 2d at 358-59. The purpose is "[t]o ensure that the complaints of a prisoner might be adequately presented,' and that purpose cannot be served "unless the attorney appointed to represent an indigent petitioner ascertains the basis of his complaints, shapes those complaints into appropriate form and presents them to the court." *Id*. Even if defendant harbored several distinct delusional beliefs (including a false belief that he observed Vitruls and Miller flee the murder scene), Dr. Latham correctly recognized, consistent with *Owens*, that delusional belief can coexist with a competent understanding of the court process and an ability to assist counsel in the preparation of

a postconviction petition. Dr. Latham also expressly opined that defendant had the "capacity to assist defense counsel in the preparation of a postconviction petition," and he did not indicate that he had any difficulty understanding defendant's contentions of constitutional deprivation. Considering Dr. Latham's testimony, we cannot say that the court's finding that defendant was fit for postconviction proceedings constituted an abuse of discretion.

¶ 82                                    B.  Second-Stage Dismissal

¶ 83     We now resume our consideration of the remaining issue that defendant raised in *Zoph II*. Defendant argues that the trial court erred in dismissing his ineffective assistance claim at the second stage of postconviction proceedings because the well-pleaded facts and attached affidavits supporting that claim, if accepted as true, made a substantial showing that his counsel was ineffective in litigating the motion to suppress confession. Defendant's argument appears to have two components. First, he contends that his counsel failed to discover that defendant's wife and purported attorney, Michelle, attempted to confer with defendant just prior to when Schletz coerced him to falsely confess. According to defendant, his trial counsel should have called Michelle as a witness at the suppression hearing because her testimony would have provided an additional basis to challenge the admissibility of the confession. Second, defendant argues that his counsel was ineffective for failing to call him as a witness at the suppression hearing, because his testimony would have contradicted the State's witnesses.

¶ 84     The Act provides a mechanism by which a person under a criminal sentence may challenge his or her conviction as being the result of a substantial denial of his or her rights under the federal or state constitution. *People v. Mendez*, 402 Ill. App. 3d 95, 98 (2010). A proceeding under the Act is not an appeal, but rather, is a collateral attack on the prior judgment. *People v. Clark*, 2023 IL 127273, ¶ 38. The Act allows "inquiry into constitutional issues relating to the conviction or

sentence that were not, and could not have been, determined on direct appeal." *Id.* (quoting *People v. Barrow*, 195 Ill. 2d 506, 519 (2001)). Thus, all issues decided on direct appeal are *res judicata*, and all issues that could have been raised, but were not, are forfeited. *People v. Harris*, 224 Ill. 2d 115, 124-25 (2007).

¶ 85 The Act establishes a three-stage process for the adjudication of petitions for postconviction relief. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). At the first stage, the trial court independently examines the petition to determine whether the allegations, when liberally construed and accepted as true, set forth the gist of a constitutional claim. A petition that does not meet this low standard is considered "frivolous and patently without merit" and should be summarily dismissed. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009).

¶ 86 If the petition is not summarily dismissed, it advances to the second stage, at which point the State enters the litigation. The State may either answer the petition or move for dismissal. *People v. Dupree*, 2018 IL 122307, ¶ 28. If the State moves to dismiss the petition, the trial court may hold a dismissal hearing, which is considered part of the second stage. *People v. Clark*, 2011 IL App (2d) 100188, ¶ 16. The court may not engage in any factfinding at a dismissal hearing, because all the well-pleaded facts in the petition are to be taken as true unless they are positively rebutted by the record. *Id.* The court also is not permitted to make any credibility determinations at the second stage. *People v. Domagala*, 2013 IL 113688, ¶ 35. A defendant is entitled to a third-stage evidentiary hearing "only when the allegations in the petition supported by 'affidavits, records, or other evidence' [citation] make a substantial showing of a deprivation of rights under either the United States or Illinois constitutions or both." *Dupree*, 2018 IL 122307, ¶ 28 (quoting *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002); and *Domagala*, 2013 IL 113688, ¶ 33). A "substantial showing" of a constitutional violation is made only if the petition's well-pleaded

allegations, if proven at an evidentiary hearing, would entitle the defendant to relief. *Domagala*, 2013 IL 113688, ¶ 35. We review *de novo* the dismissal of a postconviction petition at the second stage of proceedings. *Dupree*, 2018 IL 122307, ¶ 29.

¶ 87 To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness, and the deficient performance so prejudiced defendant that he did not receive a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish deficient performance, a defendant must show that "his counsel's performance was so inadequate that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Smith*, 195 Ill. 2d 179, 188 (2000). To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

¶ 88 We begin by addressing defendant's claim that his trial counsel was ineffective for failing to discover that Michelle attempted to confer with him during his interrogation prior to defendant making any incriminating statements. Effective counsel, according to defendant, would have discovered these circumstances and called Michelle as a witness at the suppression hearing, whose testimony "would have provided an alternative reason to suppress" his confession. Because the precise sequence of the pertinent events and statements concerning defendant's confession is paramount to this claim, the affidavits must necessarily be viewed together. As noted, Michelle averred that she arrived at the sheriff's office at approximately 12:30 p.m. and attempted to see her "client," defendant, but she was "denied access." She further averred that she attempted to see defendant "a few hours later," but she "again was denied access." Michelle also called the sheriff's office later that evening but was "given no information." The timing of Michelle's arrival at the

sheriff's office is important because, according to defendant's affidavit, he did not make any incriminating statements until 1:00 p.m., when he was coerced into copying the statement that Schletz had prepared.

¶ 89    It is well established that trial counsel has a "professional duty to conduct 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Domagala*, 2013 IL 113688, ¶ 38 (quoting *Strickland*, 466 U.S. at 691). This duty arises from "counsel's basic function 'to make the adversarial testing process work in the particular case.' "   *Id*. (quoting *Strickland*, 466 U.S. at 690).   The duty includes the obligation to independently investigate any possible defenses. *Id*. When a defendant claims that his counsel failed to investigate, we judge that claim "against a standard of reasonableness given all of the circumstances, 'applying a heavy measure of deference to counsel's judgments.' " *Id.* (quoting *People v. Kokoraleis*, 159 Ill. 2d 325, 329 (1994)).   Moreover, reasonableness of counsel's challenged conduct must be evaluated "on the facts of the particular case, viewed as of the time of counsel's conduct." *People v. Hughes*, 2012 IL 112817, ¶ 61 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000)).   Where the record establishes that counsel knew or, from an objective standpoint, had reason to know that a possible defense was available, the failure to investigate can constitute ineffective assistance of counsel. *Domagala*, 2013 IL 113688, ¶ 38.

¶ 90    Defendant's argument is fatally flawed.  It is true that, if credited, the affidavits would tend to show that Michelle attempted to confer with defendant some thirty minutes before he incriminated himself, and the investigators improperly denied him the ability to confer with counsel in violation of defendant's rights.  However, defendant provides no basis or argument to support a necessary component of this claim—that his counsel either knew or should have known about Michelle's rebuffed attempt to confer with defendant.  Defendant's postconviction petition

and the affidavits attached to it are silent on this point and, even on appeal, defendant provides no explanation as to *how* he believes his counsel should have learned this information. As emphasized by the trial court in dismissing the petition, there is simply no indication that Michelle divulged this information at any point before or during the trial. Her affidavit does not state that she informed or tried to inform defense counsel of her interaction at the sheriff's office, and it does not state that she communicated this information to defendant, either.

¶ 91 Likewise, defendant did not indicate in his affidavit that Michelle conveyed this information to him before trial or even that he told his attorney to speak with her. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Strickland*, 466 U.S. at 691. Defendant's trial counsel certainly is not omniscient, and so counsel necessarily must first have been informed of the circumstances of Michelle's interaction at the sheriff's office to trigger counsel's obligation to pursue that information. Counsel cannot be deemed ineffective for failing to elicit testimony of which he is unaware and has no reason to discover. See *People v. Humphries*, 257 Ill. App. 3d 1034, 1043 (1994) ("[a]n attorney cannot be said to be ineffective for failing to call a witness whose *** potential testimony [is], through no fault of the attorney, unknown to him or her").

¶ 92 If anything, the record demonstrates that the information available to defense counsel at the time of the suppression hearing strongly indicated that Michelle was hostile to defendant and would have offered nothing to further his effort to suppress the confession. In an October 2019 supplemental *pro se* postconviction petition, defendant attached a copy of a police report prepared

on July 1, 2004, by Investigator "A. Jones." The report related that on June 29, 2004, Jones and Investigator Russell Jonitis were in the Lake Villa area attempting to locate defendant. Michelle approached them while they were sitting in an unmarked police vehicle, and Jonitis recognized her to be defendant's wife. Michelle appeared nervous, and her hands were visibly shaking. She told them that she believed they were looking for defendant "[b]ecause he killed his aunt." According to the report, Michelle advised that defendant was "not well" and that he had just been released from prison about ten days earlier. She feared for her safety and believed that Walker would not have allowed defendant into her home. The report indicates that Jones gave Michelle his business card, and Michelle agreed to meet with him at the sheriff's office for an "in-depth interview in the next day or two."

¶ 93   The police report further indicates that, on June 30, 2004, at 1:45 p.m., Jones and Jonitis interviewed Michelle at the sheriff's office. During the interview, Michelle disclosed her history with defendant, who had physically abused her. Michelle also reported that defendant attempted to shoot her father in 2003, and that defendant had been incarcerated in connection with that incident. Michelle visited defendant in prison one time, when she asked him to sign divorce papers. Defendant stated that he would agree to the divorce, but he intended to take their two children away from her, and he threatened Michelle that she would never see their children again. The report also states that Michelle received an order of protection against defendant on June 16, 2004, which was thirteen days before Walker was murdered. Despite the order of protection, Michelle and their children spent time with defendant at a hotel after he was released from prison. Defendant "did not appear to be acting normally" at the hotel. He spoke of his father's will and how he felt that he was "screwed" by his family because he did not inherit everything that he felt he was entitled to receive. Michelle also reported that she took defendant to the courthouse to

request a copy of his father's will, and defendant thereafter borrowed Michelle's vehicle to drive to his uncle's house in Indiana, so that he could discuss the matter with him. That was the last time Michelle had spoken to defendant. Michelle also stated that defendant is an "actor" and that, although he has "emotional issues[,] he can act different ways for different people." The report does not indicate that Michelle identified herself as an attorney or that she had unsuccessfully attempted to contact defendant immediately before her interview with Jones and Jonitis.

¶ 94     Defendant makes no assertion in his postconviction petition that the State failed to tender this police report to his counsel or that counsel was somehow unaware of the report. Defendant acknowledges in his October 11, 2019, *pro se* petition that the report was "in Discovery" as part of his trial. Thus, counsel cannot be said to have been ineffective for failing to raise the issue within the pretrial motion to suppress, because counsel undoubtedly knew of the report but had no reason to suspect that Michelle had attempted to contact defendant during his interrogation.

¶ 95     Moreover, the record demonstrates that the trial court permitted defendant to make several non-collect telephone calls to Michelle in the months leading up to counsel's filing of the motion to suppress. For example, one court order stated that defendant should "be given as many attempts as is necessary to reach his wife for said phone call." Defendant does not contend that he was denied the ability to converse with Michelle before trial, and it is reasonable to infer that they were in some form of contact during this time. Michelle either never told defendant that she attempted to contact him during his questioning at the sheriff's office, or she did inform defendant, but he neglected to relay that information to his counsel. Either way, the failure to raise this issue within the motion to suppress cannot be attributed to trial counsel. Indeed, we note that in that same October 11, 2019, postconviction petition, defendant asserts: "At 12:30 on June 30th, 2004[,] Attorney Michelle Tully was denied access to the defendant. The Defendant's Defense counsel

was not aware of any of this information at the time the Defendant's case went to trial." This statement underscores the flaw in defendant's argument because it acknowledges that counsel knew nothing of Michelle's purported attempt to contact defendant during the interrogation. Defendant offers no explanation as to how counsel should have discovered this information.

¶ 96 Defendant argues extensively in his brief that the trial court's dismissal of his postconviction petition was erroneous because the court made improper findings of fact and credibility, which is inappropriate at the second stage of proceedings. We agree that, at least in part, the court's ruling was grounded in credibility determinations, which contravenes the requirement that the court accept the truth of the factual allegations for purposes of its analysis. In particular, the court commented that the interrogation timeline, as testified to by Schletz and Harris at the suppression hearing, demonstrated that defendant had already incriminated himself by 12:30 p.m. However, defendant averred that he made no incriminating statements until 1:00 p.m. The court was required to accept that assertion as true for purposes of a second-stage hearing. *People v. Phyfiher*, 361 Ill. App. 3d 881, 884 (2005) (at the second stage, the court is "foreclosed from engaging in any factfinding because all well-pleaded facts not rebutted by the record are to be taken as true"). Nevertheless, our review of the record confirms that the court's dismissal of this claim was not based primarily on credibility determinations. Defendant ignores that the petition and the attached affidavits made no assertion that either Michelle or defendant informed trial counsel that Michelle had attempted to confer with defendant during his interrogation but was denied access. As the trial court correctly recognized, this circumstance was "more important" than the apparent evidentiary conflict between defendant's affidavit and the testimony that Schletz and Harris provided at the suppression hearing. That it made credibility determinations does not alter the fact that the affidavits failed to allege facts sufficient to trigger counsel's duty to

investigate this claim. Moreover, "we review the trial court's judgment, not its reasoning, and we may sustain the judgment on any basis in the record." *People v. Brown*, 2022 IL App (4th) 220171, ¶ 9. Defendant had the burden of pleading and making a substantial showing that he received ineffective assistance of counsel. See *People v. Lundy*, 334 Ill. App. 3d 819, 933 (2002). He failed to carry that burden, because he did not demonstrate that his trial counsel had any basis to suspect that Michelle attempted to contact him during the interrogation. Accordingly, we find no error in the court's dismissal of this aspect of defendant's ineffective assistance claim.

¶ 97    The second and final component of defendant's ineffective assistance claim is that his counsel failed to call him as a witness at the suppression hearing. Again, in his *pro se* postconviction petition, defendant asserted that he would have testified at the hearing that the investigators made various promises and threats to induce him to confess to the murder. This claim was properly dismissed because defendant has forfeited it. Defendant could have raised this claim on direct appeal, as the circumstances of his purported coercion most certainly would have been known to him at the time of his direct appeal. Indeed, his trial counsel *did* argue in the motion to suppress that defendant did not knowingly and intelligently waive his *Miranda* rights. Therefore, defendant could have argued on direct appeal that his counsel was ineffective for failing to procure this testimony at the suppression hearing. Defendant did not argue in his postconviction petition that appellate counsel was ineffective for failing to raise this issue on direct appeal. Thus, the argument is forfeited for purposes of this postconviction proceeding. See *People v. Blair*, 215 Ill. 2d 427, 454-55 (finding claim forfeited where the facts supporting it were already in the record).

¶ 98                                   III. CONCLUSION

¶ 99    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 100   Affirmed.